CAIN v DEPARTMENT OF CORRECTIONS

Docket Nos. 101628, 101736. Argued December 6, 1995 (Calendar No. 8).
     Decided May 21, 1996.

The Department of Corrections sought to disqualify Ingham Circuit
     Judge James R. Giddings under MCR 2.003 from presiding in *Cain
     v Department of Corrections*, a prisoners' class action against the
     department regarding the type and quantity of personal property
     that prisoners would be allowed to possess, asserting that, as a
     result of Judge Giddings' bias and prejudice against the depart-
     ment, it would be denied a fair trial. The court, James R. Giddings,
     J., denied the department's motion, finding that actual prejudice
     had not been shown. Chief Judge Peter D. Houk also denied the
     motion. The Court of Appeals, GRIFFIN, P.J., and D. E. HOLBROOK, JR.,
     and WEAVER, JJ., in an unpublished order, peremptorily reversed,
     ordered that Judge Giddings be disqualified, and remanded the
     case for the appointment of a different judge (Docket No. 179431).
     The plaintiffs and plaintiffs-intervenors appeal.

     In an opinion by Justice MALLETT, joined by Justices LEVIN,
     CAVANAGH, and BOYLE, the Supreme Court *held*:

     Disqualification of Judge Giddings was erroneously ordered by
     the Court of Appeals, requiring reversal and remand for immediate
     scheduling of trial.

     1. Under MCR 2.003(B)(1), a judge who cannot hear a case
     impartially may be disqualified. A showing of actual bias or
     prejudice for or against a party or attorney must be made by affida-
     vit filed within fourteen days after the moving party discovers the
     ground for disqualification. Absent actual bias or prejudice, a judge
     will not be disqualified. MCR 2.003(B)(1) also requires that the
     judge be personally biased or prejudiced to warrant disqualifica-
     tion. The challenged bias must have its origins in events or sources
     of information gleaned outside the judicial proceeding.

     2. The party challenging a judge on the basis of bias or prejudice
     must overcome a heavy presumption of judicial impartiality. If the
     requirement of showing actual bias or prejudice under MCR
     2.003(B) has not been met, or if the court rule otherwise is inappli-
     cable, disqualification may be required in extreme cases by the Due
     Process Clause of the Fourteenth Amendment if, as set forth in

*Crampton v Dep't of State*, 395 Mich 347 (1975), the judge has been the target of personal abuse or criticism from the party before the court or is enmeshed in other matters involving the petitioner.

3. In this case, no actual bias or prejudice or personal bias as required by MCR 2.003(B)(1) has been shown. Any bias was between the judge and a nonparty, the Governor of the state. Nor does Judge Giddings' apparent conflict with the Governor provide a proper basis for disqualification under *Crampton*.

Chief Justice BRICKLEY, joined by Justices LEVIN, CAVANAGH, and BOYLE, concurring, stated that the majority's and the dissent's debate over whether the Governor was a party to this litigation obscures the essential issue, which, under the court rule, is whether Judge Giddings can impartially hear the underlying case. Nothing in the facts presented suggests that he cannot.

Reversed and remanded.

Justice RILEY, dissenting, stated that Judge Giddings should be disqualified under *Crampton* because he became enmeshed in other matters involving the petitioner and became the target of personal abuse or criticism from the party before him, thereby denying the petitioner the right to a fair and reasonably timely adjudication of its rights on the underlying claim. Further, he should be disqualified under MCR 2.003, because he has demonstrated personal bias against the department. The substantial assistance given to the plaintiffs in this case by Judge Giddings sufficiently demonstrated that he was actually biased.

Justice WEAVER took no part in the decision of this case.

John C. Cain, Elton F. Mizell, John C. Ewing, C. Pepper Moore, Raymond C. Walen, Jr., Paul A. Dye, Delbert M. Faulkner, Ramon Cobos, and Ronald Simpson-Bey, in propria persona.

*Mark Granzotto* for the plaintiffs.

*Chiamp & Associates, P.C.* (by *Charlene Snow*), and *Deborah LaBelle* for the plaintiff-intervenor-appellants.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *A. Peter Govorchin*, Assistant Attorney General, for the defendant.

Amici Curiae:

*White, Przybylowicz, Schneider & Baird, P.C.* (by *Thomas A. Baird* and *Kathleen Corkin Boyle*), and *Adkins & Garcia* (by *James D. Adkins*) for Ingham County Bar Association, Inc.

*Mark Granzotto* for ACLU Fund of Michigan, *Neal Bush* for National Lawyers Guild, *Jeffrey T. Meyers* and *Richard E. Shaw* for Michigan Trial Lawyers Association, and *John R. Minock* for Criminal Defense Attorneys of Michigan.

MALLETT, J. In this factually intricate case, we are asked, in an interlocutory appeal, to decide whether the judgment of the Court of Appeals, calling for the disqualification of a circuit court judge, is proper. Ingham Circuit Judge James R. Giddings[1] denied the Department of Corrections' motion to disqualify himself. Chief Circuit Judge Peter D. Houk also denied the disqualification motion. The department appealed in the Court of Appeals. The Court of Appeals panel (GRIFFIN, P.J., and D. E. HOLBROOK, JR., and WEAVER, JJ.), ordered that Judge Giddings be disqualified and therefore reversed the findings of Chief Judge Houk and remanded the case for the appointment of a different judge. This Court granted appellants' (plaintiffs' and plaintiffs-intervenors') interlocutory applications for leave to appeal. We now reverse and remand for proceedings consistent with this opinion.

---

[1] Until his disqualification in this case, Judge Giddings has sat as both an Ingham Circuit judge and as a judge of the Court of Claims. Primarily, this case has been a Court of Claims case; thus, Judge Giddings, rather than a jury, is the finder of fact.

I

PROCEDURAL BACKGROUND

The issue presented to this Court regarding the disqualification of Judge Giddings is an outgrowth of a prisoners' rights class action originally filed in 1988.[2] The pertinent procedural history of this litigation will now be set forth.[3]

In 1985, the Department of Corrections issued a policy directive to address the subject of prisoner personal property control. It is important to note that for purposes of personal property, this 1985 policy directive did not differentiate between security classifications of the prisoners. In 1988, as a result of the massive prison construction program responding to the large increases in prisoner population that began in 1984-85, the department attempted to revise its 1985 policy directive. It decided that changes needed to be made in its policy regarding the type and quantity of personal property that prisoners would be allowed to possess.[4] This 1988 revised policy directive specifically associated the type and amount of per-

---

[2] This class action involves two classes of plaintiffs. The original plaintiffs are male prisoners numbering greater than 36,000. This class is proceeding in propria persona. The second class, the plaintiffs-intervenors, is comprised of over 1,700 women prisoners. This class is represented by counsel. Further, several other individual cases filed by prisoners have been consolidated with this one at the request of the Department of Corrections.

[3] As a result of this case having been filed in 1988, many volumes of lower court records have been generated. Out of necessity and brevity, this opinion will attempt to keep the procedural facts contained in these pretrial volumes to a minimum.

[4] The department was also opening a new level VI ("super max") security classification for prisoners with substantial behavioral problems and wanted to restrict level VI prisoner access to personal property.

sonal property afforded to a prisoner with the security classification of the prisoner.[5]

Approximately two months later, on April 26, 1988, six male prisoners filed a complaint and a request in the Court of Claims for an ex parte temporary restraining order.[6] These individuals challenged the department's authority to reduce or change possession of personal property by prisoners. The primary cause of action asserted by the plaintiffs and the plaintiffs-intervenors is that the security classification system created by the department is arbitrary and capricious and violates the Michigan and United States Constitutions because the policy directive involves the taking of personal property by the department that is dependent on the security classification system.

On April 27, 1988, Judge Giddings entered a temporary restraining order that precluded the department from implementing its 1988 revised policy. On September 26, 1988, Judge Giddings granted the female prisoners' motion to intervene. Subsequently, the

---

[5] On March 2, 1988, the department issued an implementation preparation memo and a revised version of its policy directive.

Increased personal property shall be afforded to prisoners as their custody level is reduced. [1988 Policy Directive, PD-BCF-53.01, p 2.]

[6] Two courts are involved in this case, the Ingham Circuit Court (Docket No. 88-61119-AZ) and the Court of Claims (Docket Nos. 93-15000-CM and 93-14975-CM). Apparently, as explained by plaintiffs-intervenors' counsel, Charlene Snow, the original complaint of the male plaintiffs was filed in the Court of Claims with a circuit court suffix number. The Ingham Circuit Court clerk's office opened the case as a circuit court action and put it on its docket. Judge Giddings found the error and recommended that it be corrected. Judge Giddings has served as the judge in this matter in both courts.

respective classes of male and female prisoners were certified.

On August 21, 1989, the Legislature entered this arena by giving effect to MCL 800.42;  MSA 28.1411.[7] Although Judge Giddings' order enjoined the department's 1988 revision of its personal property policy directive, this statute served to impose similar limitations on the type and quantity of personal property that could be possessed by prisoners at differing levels of security. This caused the male prisoners to file a motion to enjoin the enforcement of this statute that was granted by Judge Giddings after a hearing on the matter on September 18, 1989.[8] This preliminary injunction was reduced to writing and entered on November 14, 1989.[9] The injunction currently remains in effect.

---

[7] A general idea of the nature of the statute, MCL 800.42;  MSA 28.1411, can be gleaned from the following:

> A prisoner in a correctional facility having a security designation of IV, V, or VI shall not wear or have in his or her living area any personal clothing, except that a prisoner in a correctional facility having a security designation of IV may keep 1 set of personal clothing as determined by the department in his or her living area and may wear such clothing for court appearances or during visits. A prisoner in a correctional facility having a security designation of V or VI shall be provided civilian clothing by the institution for jury trials or as ordered by the court for other court appearances. [MCL 800.42(1);  MSA 28.1411(1).]

[8] The plaintiffs' motion also sought to enjoin the implementation of the department's new emergency rules 3 and 4 concerning prisoner personal property that were set to take effect on October 1, 1989, and any revision of the department's 1985 version of its personal property policy. This was also included in Judge Giddings' order.

[9] The preliminary injunction reads:

> It is ordered that from and after September 18, 1989, Defendant, its officers, agents, servants, employees, and those acting in concert or participation with them are restrained and enjoined from:

II

DISQUALIFICATION: SIGNIFICANT BACKGROUND EVENTS

The road leading up to the department's motion to disqualify Judge Giddings has been long, winding, and bumpy. The focus of the department's motion centers on the relationship (or lack thereof) between Judge Giddings and Governor Engler. In the interest of time and space, this opinion will only recount the essential facts culminating in the department's decision to seek the disqualification of Judge Giddings.

The preliminary injunction issued by Judge Giddings generated numerous disputes over control of prisoner personal property. Many prisoners brought contempt proceedings against the department, alleging that it was violating the November 1989 injunction.[10] As a result, prisoners were often required to appear in court as witnesses to the alleged violation. A question arose concerning whether these individuals were entitled to receive the statutory witness fee pursuant to MCL 600.2552; MSA 27A.2552. On October 7, 1993, at a hearing on the issue, Judge Giddings decided that the prisoners were entitled to receive their statutory witness fee of $12 a day.[11]

---

(1) implementation of MCL 800.42 until further order of this Court;

(2) implementation of any version of PD-BCF-53.01 subsequent to the 9-16-85 version until further order of this Court; and

(3) the Defendant agrees that implementation of Emergency Rules 3 and 4 as to personal property be restrained until further order of the Court.

[10] As a result of the quantity of contempt lawsuits that were being filed by prisoners, Judge Giddings appointed a monitor on February 14, 1990, to look into prisoner complaints. Three different individuals have subsequently served as the monitor in this case.

[11] Judge Giddings based his decision on a literal interpretation of the statute as well as a recent United States Supreme Court case, *Demarest v*

On Thursday, October 14, 1993, while attending a dedication ceremony for the Saginaw Regional Correctional Facility, Governor John Engler made a comment regarding Judge Giddings that evidenced the Governor's distaste for the witness fee ruling.[12] At the time, Judge Giddings stated that he would not respond to the Governor's comments. However, "[p]ursuant to [his] ethical obligation imposed . . . by Subsection 3B(3)[13] of the Code of Judicial Conduct," Judge Giddings sent a letter to the Attorney Grievance Commission regarding the Governor's state-

_____

*Manspeaker*, 498 US 184; 111 S Ct 599; 112 L Ed 2d 608 (1991). At the conclusion of the hearing, Judge Giddings stated on the record:

> The long and the short of it is simply this, the statute is clear. Every person who goes to court gets a witness fee subject to the exceptions set forth therein. There is no exception for prisoners. If the Legislature wants to adopt exceptions, that's up to them. They haven't done that. Since they haven't done it, that's the rule. So, they would be entitled to their witness fees.

It should be noted that after this decision, the Legislature amended the statute so that prisoners are no longer entitled to the statutory witness fee.

[12] "The guy's a lunatic. I think he got his law degree from a mail-order school . . . . It's outrageous that we're now going to pay incarcerated persons to testify against us." Detroit Free Press, October 15, 1993, p 1B. Furthermore, after being pressed by the state bar to apologize to Judge Giddings, the Governor refused. However, he did issue an apology to the Wayne State University Law School and its graduates. The Governor stated:

> I was surprised when I read that (Giddings went to Wayne State), because I've appointed many graduates of the Wayne State University law school to the bench . . . . They're outstanding, learned judges so it's inconceivable to me that Jim Giddings went to the same school. He may have gone there, but he didn't learn the same law or the same appreciation of the constitution . . . . I think his rulings are off the wall and I think the Legislature is probably going to intervene to eliminate the right of prisoners sitting in their cells to conjure up legal actions in order to keep drawing witness fees . . . . [Lansing State Journal, October 16, 1993, p 1B.]

[13] The Code of Judicial Conduct, Canon 3B(3), states:

ments on October 21, 1993. In his letter, Judge Giddings stated that the Governor's statements appeared to violate Rules 3.5,[14] 8.2,[15] and 8.4(c),[16] of the Michigan Rules of Professional Responsibility.[17] On Febru-

A judge should take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge may become aware.

[14] MRPC 3.5(c) states:

A lawyer shall not . . . engage in undignified or discourteous conduct toward the tribunal.

[15] MRPC 8.2(a) states:

A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicative officer, or public legal officer, or of a candidate for election or appointment to judicial or legal office.

[16] MRPC 8.4 states:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) engage in conduct involving dishonesty, fraud, deceit, misrepresentation, or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer;

(c) engage in conduct that is prejudicial to the administration of justice;

(d) state or imply an ability to influence improperly a government agency or official; or

(e) knowingly assist a judge or judicial officer in conduct that is a violation of the Code of Judicial Conduct or other law.

[17] Judge Giddings' letter sets forth his own reasons regarding why he believed that the Governor's statements crossed the line and were examples of professional irresponsibility. For example, in addition to the statements made to the press, the Governor issued two press releases dealing with the *Cain* litigation.

The first, entitled *Governor Criticizes Judge for Micro-Managing Prisons,* was released on August 17, 1993, in which the Governor stated that "Judge Giddings ought to let [the corrections professionals] do their jobs and stop coddling convicts." The second press release, dated October 14,

ary 7, 1994, the Attorney Grievance Commission informed Governor Engler that Judge Giddings' request for investigation was dismissed. However, the commission "cautioned" the Governor regarding the ramification of such comments on the integrity of Michigan's legal system.[18]

Additionally, during this time, the news media were taking great interest in the Governor's press releases and comments in this case. The record indicates that Judge Giddings was progressively becoming concerned over the statements reported by the press. Particularly, Judge Giddings focused on the substance of the Governor's press releases. On November 2, 1993, Judge Giddings held a hearing to address miscellaneous matters. At this time, Judge Giddings discussed what he termed to be "inaccuracies" in statements made to the press.[19] Further, Judge Giddings

---

1993, was again in response to the witness fee ruling. Judge Giddings closed his letter by stating, "I bring these matters to your attention so that you may deal with them as your duties require."

[18] While this file is being closed, the Commission wishes to caution you regarding the adverse consequences that derogatory remarks such as those made by you against Judge James Giddings, can have on the entire legal system of this state. As you are a licensed attorney, the Commission is confident that you share its concerns in this regard.

[19] According to Judge Giddings, one of the inaccuracies was found in the Governor's press release of October 14, 1993, which suggested that the prisoners' witness fees were being paid by the taxpayers. Judge Giddings stated:

Those, who were present, know full well that, in fact, those fees would be paid out of Prisoner Benefit Fund, not taxpayers funds, and if and whether the taxpayers would ever be required to pay those witness fees is highly speculative at best.

However, Judge Giddings felt as if his rulings had been mischaracterized in the press. He further commented that members of the press contacted him at home. Judge Giddings decided that

questioned whether it would be appropriate for him to respond to what he felt were incorrect statements made by a litigant.[20]

---

the Department [should] make some provision whereby somebody can speak on behalf of the male prisoners. [T]he female prisoners have their own spokesperson [and] some mechanism [should] be devised whereby . . . somebody, will be made available to authorized representatives of the news media within say 30 minutes after the Department contacts so that they can say here's what the ruling was. . . . Because I just don't want to be put in that position and I want to be certain, at least, there is a fair opportunity for the media to have a balanced view of what is transpiring because to some extent some of the statements that have been made may affect this Court's ability to administer this class action. . . . I don't believe that I should be called on to respond to these statements.

[20] The following are relevant portions of the November 23, 1993, hearing transcript:

*The Court*: I don't believe that I have to respond to patent, false statements about this case. . . . *The State is one entity of three parties in this case. Does this Court have or is this Court restricted from controling* [sic] *the behavior of a litigant that tells untrue statements about the status of this case. I don't believe so.*

\*　　\*　　\*

This is a release [the August 17, 1993 release], I assume, that went to every newspaper. . . . I have to be able to respond to all of those. I shouldn't have to respond to any of them. That's not my job. I'm not a litigant.

\*　　\*　　\*

Maybe this is poor reporting. I do not know. I can't tell. Nobody's name is down on a press release. I can't say who is responsible for that. But, I do have two press releases that either make outright false statements about the Court's ruling or implied false statements. *It would not surprise me to believe that the source of this information is from some agent of the State of Michigan, probably the Department of Corrections.* I know one thing, it didn't come from you, Mr. Govorchin, because I think, one, you wouldn't make such a statement.

*Mr. Govorchin*: I have said so before and that's absolutely true, that I didn't make any of those statements. I don't do that.

*The Court*: I know you wouldn't. I say that without qualification.

\*　　\*　　\*

The next significant event took place on June 2, 1994, when Judge Giddings, sua sponte, entered an order responding to what he viewed as the media problems surrounding the case. The media contacts order reads, in pertinent part:

> This matter having come before the Court as a result of media contacts with the Court and the Court being made aware of certain inaccurate reports disseminated to the public media by representatives of the Michigan Department of Corrections (MDOC) and other state agents, and the Court perceiving the need to impose reasonable steps to foster an environment to allow the case to be fairly litigated, and the Court being fully advised in the premises, it is hereby sua sponte ordered that:
>
> (1) Any written remarks or press releases made or given to a member of the press by any employee or agent of the State, regarding this *Cain* litigation, must also be faxed to Plaintiffs' spokesperson Linda Forster, Plaintiff class-member Mark Coleman and Plaintiffs' counsel Charlene Snow at the same time that the remarks are provided to the public media. Similarly, any remarks or press releases given by the Plaintiffs to the public media must be faxed to Defendant's

---

The real question is is it proper for me to respond to *statements by a litigant*[?] I don't believe so.

*Mr. Govorchin:* I wouldn't think so. That's why I'm not sure why you're involved with this and why I'm involved with this. If the Governor's office decided to say something, they're not a party to this case. This is the Department of Corrections.

*The Court: As a matter of fact, the State is one entity. I was not aware that the Department of Corrections is a separate legal entity from other state agencies.*

*Mr. Govorchin:* Well, it must be, if we're being held to a fairly high standard then of accountability because now I'm responsible for statements by 65 thousand people. I never see them. I can't keep a rein on stuff like that.

*The Court:* I'm not asking that you do. I'm simply saying that in my opinion, if I'm wrong . . . take it up to the Court of Appeals. . . . Let the Court of Appeals say it is my job to sit here and respond to these public statements. [Emphasis added.]

Counsel, A. Peter Govorchin, Assistant Attorney General,
and the Michigan Department of Corrections' press spokes-
person, Warren Williams.

Subsequently, the department moved that this order
be stayed pending appeal on the merits because the
order allegedly restricts the free speech of all state
employees. Further, the plaintiffs moved for guidance
concerning the interpretation of the June 2, 1994,
order. After a hearing on June 30, 1994, the court
granted the plaintiffs' motion for clarification of the
June 2, 1994, order and denied the department's
motion for a stay. Much of the discussion during the
hearing revolved around who could be included in the
scope of the media contacts order.[21] Particularly of

---

[21] The transcript of the hearing reflects the following:

*Ms. Snow*: . . . [I]t seems to me that it is clear that the Court
meant only to direct [the June 2 order] to those people from the
State of Michigan who have some kind of interface with this case,
not any individual who simply chose to write a letter.

*The Court*: So would not that include the Governor?

*Ms. Snow*: It appears that the Governor is choosing to have
interface with this case. I'm not sure whether Mr. Govorchin or Mr.
Soros directly represent the Governor. I guess this is kind of a twist
in the situation.

*The Court*: I assume he is the chief executive officer. I assume
the director . . .

*Ms. Snow*: He is the boss of director McGinnis who's the
Defendant's . . .

*The Court*: In the final analysis I presume that he has something
to say about the operation of the Department of Corrections
depending on the extent to which that may or may not be related.

\*     \*     \*

*Mr. Govorchin*: [The order] should be limited to the Department
of Corrections employees. Anything beyond that I think is beyond
even the scope of the remedy the Court was trying to fashion with
regard to the *Cain* case.

So is the Governor covered? No. I don't represent the Governor in this proceeding. Have never represented to the Court that I do. And that's not been our position. . . .

*The Court:* . . . [I]n terms of a legal entity, there may be a unity between the Department of Corrections, and for that matter the DNR and the Governor. And I don't know. They're probably one legal entity.

I am not sure the Department of Corrections, although they remain as a Defendant here, whether or not the Department as such is technically a legal entity in the traditional sense. I am not sure.

*Mr. Govorchin:* Well, our argument is that they are separate and distinct for the purposes of this litigation, from the Governor's office and from the other State Departments.

After this exchange took place, the court stated to the parties its motivation behind issuing the June 2, 1994, order.

*The Court:* [I]nsulating the Court from criticism was certainly not the purpose. Anybody and everybody has the right to criticize the Court, criticize the Court's rulings and the basis for the Court's rulings. However, I have[n't] been presented with any authority that suggests that people have the right to misrepresent the Court's rulings when they involve—in the business before the Court.

I don't know of any authority that gives people the right to, for example, when I enter an order, that enables the Department to live up to their duties under 53.01, that I am somehow ordering the Department to make color televisions available to prisoners. Absolutely absurd.

\*    \*    \*

So the purpose of that order is not to level the playing field but to be an enducement [sic] on those who write of this case to take care to make sure that they write accurately and to at least provide a mechanism so that if others happen to write incorrectly, they may have a judicial right to be wrong. I think they do. But someone else may pick that up and say, no, that's not what happened. This is what happened.

I really don't care if somebody wants to say that my decisions are ill reasoned and Judge Giddings was not logical, or I did not follow the law. Fine. That's their opinion.

\*    \*    \*

*The purpose was to see that those who are involved in the litigation and purport to speak with authority about this litigation,*

concern was whether the Governor could be included within the scope of the order.

> And I'm going to close with this one point and emphasis [sic] that frankly, I gave a lot of thought as to whether or not the chief executive should be included within the scope of this order. . . .
>
> [O]n several occasions he has taken upon himself to speak directly about this case and purports to speak with authority. And I assume he does. As the Governor of the state he has access to information, and those who work for the Department of Corrections are accountable to him at some level and because of that supervisory authority, and because he both apparently and actually, it seems to me that if he is going to speak on this, and because there is that history there—and I already referenced of fairly significant misrepresentation, not the criticism. I'm talking about misrepresentations of what, in fact, this court did. It seems to me that in that context, it's appropriate to include him within this requirement that copies of those remarks be forwarded to relevant persons in this lawsuit.

Judge Giddings then issued an order clarifying his previous order. Specifically, the revised order stated:

> (1) Any written remarks or press releases made or given to a member of the press by the Governor or his Press Secretary, or by the Department of Corrections Director; or the

---

*have a certain obligation under this court order. And only those who purport to do so.*

*Obviously any time Director McGinnis speaks he has to be speaking with authority because he's the director. Any time Warren Williams does that he has to. Seems to me the Governor is in the same position because he has supervisory authority over Director McGinnis. And as does his agents, trustors.*

*So I would grant the following clarification. Basically that any written remarks at press release be made available to the members of the press by the Governor or his press secretary, or by the director of the Department of Corrections, or his called press spokesperson.* [Emphasis added.]

Department's press spokesperson, or by any employee or agent of the Department of Corrections purporting to speak for the Department regarding this *Cain* litigation, must also be faxed to Plaintiffs' spokesperson Linda Forster, Plaintiff class-member Mark Coleman and Plaintiff Intervenors' counsel Charlene Snow at the same time that such remarks are provided to the public media.

(2) Similarly, any remarks or press releases given to the public media by agents of the Plaintiffs or Plaintiff Intervenors, including named class representatives, or any other members of the class purporting to speak for the Plaintiff or Plaintiff-Intervenors' class, must be faxed to Defendant's counsel, A. Peter Govorchin, Assistant Attorney General, and Department of Corrections press spokesperson, Warren Williams. [Order denying defendant's motion for stay of order regarding public media contact and granting clarification of order regarding public media contacts, June 30, 1994, pp 2-3.]

Clearly, Judge Giddings intended that Governor Engler be subject to the media contacts order.

The Governor rejected Judge Giddings' attempt to regulate the operation of the executive press office. In fact, through his spokesperson, John Truscott, Governor Engler announced his intention to disobey the June 2, 1994, and June 30, 1994, orders. As early as November 1993, in response to Judge Giddings' bench ruling, Mr. Truscott announced,

"We have often said there is Michigan law and then there is Giddings law and often times [sic] they are not even similar . . . . We don't expect the Department of Corrections to comply, nor will our office comply. We do not feel an obligation to inform convicted felons of state business or the legal proceedings of the state." [The Detroit News, *PR for inmates? Engler enraged,* November 24, 1993, p 1A.]

Subsequent to the issuance of the order, Mr. Truscott was quoted as stating, "I object to being ordered to fax my press releases to prisoners . . . . My job is to communicate to the media, not to murderers and rapists." The Detroit News, *Engler, judge battle over faxing news releases to inmates*, June 24, 1994. Mr. Truscott stated that, at that time, he had released about four statements from the Governor that were not forwarded to the prisoners, their attorneys, or the spokesperson for the prisoners appearing in propria persona. *Id.*

The department appealed the denial of its motion for a stay of the media contacts order to the Court of Appeals. The Court of Appeals granted the department's application for leave regarding its motion to stay the media contacts order. Further, the Court of Appeals granted the department's motion to stay, and the appeal on the merits is currently pending.[22]

In August 1994, before entry of the stay by the Court of Appeals, the Governor wrote a letter to Attorney General Frank Kelley. The letter was dated August 12, 1994, and pertained to the *Cain* litigation. The importance of this letter will become apparent below.[23] Further, during this time, on August 23, 1994,

---

[22] Therefore, this Court is not deciding the legal propriety or impropriety of Judge Giddings' June 1994 media contacts order as it relates to the parties or the Governor. The sole issue before us is whether the disqualification of Judge Giddings by the Court of Appeals was warranted under the existing court rule and case law.

[23] The letter stated in pertinent part:

I am writing to express my serious concern about yet another delay in the trial of *Cain v Michigan Department of Corrections*, pending before Ingham County Circuit Judge James Giddings. As you know, in 1988 Judge Giddings enjoined the implementation of a Department of Corrections policy and later a state statute governing the types of personal property that state prison inmates may

the Governor issued a press release addressing the recent escape of inmates from the Ryan Correctional Facility. This press release directly linked the Ryan facility outbreak with Judge Giddings' rulings in the *Cain* litigation and was not forwarded to the plaintiffs.[24]

---

possess. I understand that on Monday of this week Judge Giddings announced that the trial scheduled to begin in November of this year would be delayed yet again, this time until after January 15, 1995.

I consider this delay, and the others that have preceded it, a miscarriage of justice against the people of this state. As you know, Michigan prison inmates filed this lawsuit in April 1988. *This court, for reasons known only to it, has been unable to conduct a trial of this matter in the nearly six-and-a-half years that it has been pending.* . . .

This micromanagement of our state prisons is judicial activism run amok. It should and must be brought to an end so that management of our state prisons is taken out of the hands of the judiciary and returned to those charged by law with administering our state prison system.

I am, therefore, asking that you immediately seek a writ of superintending control from the Michigan Court of Appeals to force Judge Giddings to conduct a trial of this matter as previously scheduled in November 1994. Given the nearly seven-year duration of this case, I am convinced that this is the only way to insure its conclusion at the trial court level. The people of this state can no longer afford to have justice delayed.

Apparently, this letter was not forwarded to Judge Giddings, nor was he contacted before it was written and sent to the Attorney General. However, the letter was made immediately available to the press. See Judge Giddings' opinion, dated September 30, 1994, pp 12-13. The reasons for the delay will be set forth in a discussion of Judge Giddings' disqualification opinion.

[24] Relevant portions of the August 23, 1994, press release read as follows:

The policy [requiring the most dangerous inmates to wear uniforms] and subsequent legislation to implement the policy had been enjoined by an Ingham County Circuit Court judge in the *Cain v Michigan Department of Corrections* case. The directive from the Governor follows the prison break at the Ryan Correctional Facility in Detroit.

III

DISQUALIFICATION: THE MOST SIGNIFICANT EVENT

As a result of the Governor's failure to forward his August 23, 1994, press release to the plaintiffs, the plaintiffs filed a motion for an order to show cause why Mr. Truscott and Governor Engler should not be held in criminal contempt. This motion was scheduled to be heard on September 12, 1994. The parties and Judge Giddings each have differing perspectives of what actually took place that day.

Before a hearing on the motion, Judge Giddings, the parties, their attorneys and representatives, and the monitor held a conference in chambers off the record. The purpose of the conference was to discuss, inter alia, the plaintiffs' motion for an order to show cause regarding Governor Engler. During the course of this conference, Judge Giddings referred to the motion of the plaintiffs appearing in propria persona to show cause. He indicated to Mr. Walen that the pleadings, as filed, were inadequate. As a result,

---

The *Cain* case, dealing with the personal property of inmates, began in 1988 when the Department of Corrections attempted to implement a personal property policy that would have required high security inmates to wear uniforms. . . .

"The Department has been prevented from suiting up inmates in jumpsuits for almost seven years by one Circuit Court Judge . . .," Engler said. "If these inmates who escaped had been identified by jumpsuits, the guards would have known immediately that at least five of them were not to be allowed in the prison yard and may have been able to foil the escape before it began."

\*     \*     \*

"This breakout highlights why the Department of Corrections must be in control of our prison. It's time to get Corrections policy in place in our prisons instead of court policy from judges," Engler said.

Judge Giddings indicated that the motion needed to be redrafted. What happened next is in dispute.

Attorney General Govorchin, by way of affidavit, described the events that took place in chambers as follows:[25]

> 4. . . . Judge Giddings reviewed the [plaintiffs'] motion [to show cause] and noted that the Plaintiffs were placing more emphasis on the alleged false statements in a press release issued by John Truscott than on the assertion that the press release had not been faxed as directed in the Court's order . . . .
>
> 5. . . . Judge Giddings expressed doubt about a motion to hold John Truscott in contempt because he could probably not act on his own. Judge Giddings stated that the show cause hearing would have to be heard by a different judge. Judge Giddings then reviewed the three alleged false statements set forth in the Plaintiffs' motion and commented that the falsity of those statements was not all that clear.

---

[25] Attorney General Allan J. Soros, who also worked on the *Cain* litigation, submitted an affidavit concerning the events of the September 12, 1994, in-chambers conference.

> 10. That after reviewing said motion [to show cause], Judge Giddings stated that the contempt motion should be brought against only Governor John Engler for the reasons that Spokesperson John Truscott is not an attorney and was probably following the instructions of a superior.
>
> 11. That Judge Giddings also stated that the contempt motion should not be based on the allegation that Governor John Engler violated the Court's order regarding Public Media Contacts, but should be based on false or grossly misleading statements pursuant to MCL 600.1701(1); MSA 27A.1701(1).
>
> 12. That Judge Giddings then stated that an additional grounds [sic] for contempt may concern a letter which Governor Engler sent to Michigan Attorney General Frank J. Kelley.
>
> *          *          *
>
> 20. That Judge Giddings then instructed Class Representative Walen to file an amended contempt motion as to Governor John Engler.

Judge Giddings noted that if Plaintiff was seeking criminal contempt, the motion should set forth distinct counts describing the contempt.

*    *    *

8. *Judge Giddings then said that another statement would seem more appropriate for the motion. He referred to a letter sent by Governor Engler to Frank J. Kelley, Attorney General for the State of Michigan, on August 12, 1994. Judge Giddings asked if anyone had a copy of that letter. Both Charlene Snow, Plaintiff-Intervenors' counsel, and Plaintiffs' representative Chuck Walen had a copy. . . .*

9. *. . . Judge Giddings then read a portion of the letter out loud. That portion concerned the Governor's statement that Judge Giddings had adjourned the trial date in Cain again, "for reasons known only to the Court."*

10. *Judge Giddings stated that that statement was not true. That the record would reflect that the Cain case was adjourned due to the MDOC's non-compliance with Plaintiffs' Discovery Requests and a default entered against the MDOC.*

*    *    *

12. *Judge Giddings then implied that the Governor's letter to Attorney General Frank J. Kelley . . . would be a more appropriate basis for contempt on the basis of the "false" statement regarding the adjourned trial, under the contempt statute [MCL 600.1701(1); MSA 27A.1701(1)]. Plaintiffs' representative Walen indicated that he would revise the motion for contempt.* [Emphasis added.]

The department argued before this Court that this action by Judge Giddings is indicative of bias. Accordingly, the September 12, 1994, conference forms the basis of the department's motion to disqualify.

However, Judge Giddings viewed the in-chambers conference in a different light.[26] He described the events as follows:

> The Court has little disagreement with the summary of the in-chambers discussions and other events described [in] Defendant's Brief in Support of the Motion to Disqualify. The summary is, however, somewhat incomplete and contains inaccuracies.
>
> Serious inaccuracies are contained in the affidavits of attorneys representing the Department. With regard to the Govorchin Affidavit, *the Court disputes Mr. Govorchin's comment . . . that this Court "said that another statement would seem more appropriate for the motion." That is not correct. The Court did indicate that if Plaintiffs intended to proceed with the contempt, then they should consider including reference to inaccuracies in Governor Engler's letter of August 12th. This Court did not suggest, as asserted in . . . Govorchin's affidavit that the letter of August 12th was "a more appropriate basis for contempt."*[27]

---

[26] Judge Giddings' perspective is supported by the plaintiffs and the plaintiffs-intervenors.

[27] Further, Judge Giddings addressed the inaccuracies he found in the Soros affidavit.

> The allegations in Paragraph 11 of the Soros affidavit are completely false. This Court never indicated to Plaintiffs that they should select one as opposed to some other basis for proceeding with their order to show cause. . . . This Court never "instructed" class representative Walen to file an amended contempt motion as to Governor John Engler. Nor did the Court ever "instruct" Mr. Walen to amend the contempt motion into separate counts. The Court did suggest . . . that if Plaintiffs intend to proceed with their contempt, they may want to consider the August 12th letter. The Court also told Mr. Walen that the motion should be clearer and that this could be accomplished by spelling out separate assertions of contempt in separate counts.

Accordingly, there is a conflict between the department and Judge Giddings with respect to the events of the September 12 conference.

The department filed its motion to disqualify Judge Giddings on September 26, 1994. The hearing transcripts indicate that the department did not inform the judge or the other parties of the existence of this motion until the day it was filed.

IV

THE DEPARTMENT OF CORRECTIONS'
MOTION TO DISQUALIFY JUDGE GIDDINGS

Pursuant to the requirements of MCR 2.003, see part V, the department filed its motion for disqualification of Judge Giddings from the *Cain v Dep't of Corrections* litigation. Initially, the department argues that its motion is based on the happenings of the in-chambers meeting. Specifically, the department stated that Judge Giddings,

> actively counseled the male prisoners' "representative" on how best to pursue a motion for an order to show cause why Governor John Engler and John Truscott (the Governor's press spokesperson) should not be held in criminal contempt . . . , and . . . raised, on the Judge's own initiative, a new and additional ground that the male prisoners should utilize to pursue the allegations of criminal contempt against Governor Engler . . . . These actions, in the context of this case, demonstrate a personal legal bias on the part of Judge Giddings against Governor Engler and bias against the MDOC because Judge Giddings repeatedly stated that he considered the Governor (who is not a defendant) and the Department of Corrections (which is the only defendant) to be a single entity subject to his authority.

Accordingly, the department argues that Judge Giddings' conflict with the Governor bred animosity that was transferred into prejudice or bias against other parts of the Executive Branch. Consequently, the department contends that it will be denied a fair trial in this matter.

The department's motion to disqualify was made pursuant to MCR 2.003, which imposes a mandatory filing time of fourteen days after discovery of the grounds for the motion. Thus, the department points to September 12, 1994, as the day that the grounds for its motion surfaced. However, the department urges this Court to consider other instances occurring within the previous eleven months in support of its allegation of bias.[28]

Specifically, the department urges us first to consider Judge Giddings' "filing" of a "complaint" with the Attorney Grievance Commission because of the Governor's speech. The department further stated that Judge Giddings "repeatedly" throughout the proceedings declared there to be a unity of interest between the Governor and the department. Moreover, Judge Giddings entered the media contacts order sua sponte. Lastly, he appointed the male prisoners a press spokesperson and appointed a nonclass representative prisoner to receive the Governor's and the department's faxes of press releases.

The department contends that Judge Giddings has "demonstrated excessive personal involvement and inappropriate advocacy . . . . [His] conduct reveals a willingness and personal interest in manipulating this

---

[28] The department stated that, "[a]lthough the demonstration of bias was made on September 12, 1994, the drift to impartiality had started 11 months earlier."

litigation and using judicial time and resources to engage in a public dispute with the Governor . . . ." The department would like this Court to examine human nature and conclude from experience that the risk of bias or prejudice resulting from all of these circumstances is too great. Therefore, the department argues that all these instances, combined with the September 12, 1994, meeting, are sufficient to require the disqualification of Judge Giddings.

V

MICHIGAN DISQUALIFICATION LAW

A. THE COURT RULE

In Michigan, a motion to disqualify a judge is made pursuant to court rule, MCR 2.003. Defendant moved to disqualify Judge Giddings under what is now MCR 2.003(B)(1), which states:

> Grounds. A judge is disqualified when the judge cannot impartially hear a case, including but not limited to instances in which
>
> (1) The judge is personally biased or prejudiced for or against a party or attorney.

Further, MCR 2.003(C)(1) requires that a motion to disqualify "be filed within 14 days after the moving party discovers the ground for disqualification." The moving party must submit an affidavit including all grounds for disqualification that are known at the time the motion is filed. MCR 2.003(C)(2).

A judge is disqualified when he cannot hear a case *impartially* pursuant to MCR 2.003(B). The court rule sets forth a list of situations that are deemed to be the equivalent of an inability to hear a case impartially. One such instance is when the judge "is person-

ally biased or prejudiced for or against a party." MCR
2.003(B)(1).[29]

MCR 2.003(B)(1) requires a showing of *actual* bias.
Absent actual bias or prejudice, a judge will not be
disqualified pursuant to this section. *In re Forfeiture
of $1,159,420*, 194 Mich App 134, 151; 486 NW2d 326
(1992); *Mourad v Automobile Club Ins Ass'n*, 186
Mich App 715, 731; 465 NW2d 395 (1991); *Band v
Livonia Associates*, 176 Mich App 95, 118; 439 NW2d
285 (1989).

Coupled with the requirement of actual bias, sub-
section (B)(1) also requires that the judge be "person-
ally" biased or prejudiced in order to warrant disqual-
ification pursuant to this section. The federal disquali-
fication statutes similarly contain the requirement
that the bias or prejudice be "personal" in nature. See
28 USC 144 ("the judge . . . has a personal bias or
prejudice either against [a party] or in favor of any
adverse party"), and 28 USC 455(b)(1) ("Where [the
judge] has a personal bias or prejudice concerning a
party"). As a result of this statutory language, the fed-
eral courts have developed what is commonly known
as the "extrajudicial source" rule.

Simply stated, a showing of "personal" bias must
usually be met before disqualification is proper. This
requirement has been interpreted to mean that dis-
qualification is not warranted unless the bias or
prejudice is both personal and extrajudicial. Thus, the
challenged bias must have its origin in events or
sources of information gleaned outside the judicial

---

[29] Bias or prejudice has been defined as "an attitude or state of mind
that belies an aversion or hostility of a kind or degree that a fair-minded
person could not entirely set aside when judging certain persons or
causes." *United States v Conforte*, 624 F2d 869, 881 (CA 9, 1980).

proceeding. The United States Supreme Court addressed the "personal" bias requirement in *Liteky v United States*, 510 US 540, 550; 114 S Ct 1147; 127 L Ed 2d 474 (1994), and stated that the words "bias" and "prejudice"

> connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . ., or because it is excessive in degree . . . . [Emphasis in original.]

Further, the Court stated:

> "First, judicial rulings alone almost never constitute valid basis for a bias or partiality motion. . . . In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved. . . . Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." [*Id.* at 555.]

Thus, *Liteky* indicates that a favorable or unfavorable predisposition that springs from facts or events occurring in the current proceeding may deserve to be characterized as "bias" or "prejudice." However, these opinions will not constitute a basis for disqualification "*unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.*" *Id.* (emphasis added). See also *United*

*States v Young*, 45 F3d 1405, 1415 (CA 10, 1995), interpreting *Liteky, supra*.[30]

Furthermore, the party who challenges a judge on the basis of bias or prejudice must overcome a heavy presumption of judicial impartiality. *In re Forfeiture of $1,159,420, supra* at 151.[31]

### B. THE *CRAMPTON v DEP'T OF STATE* STANDARD

The Due Process Clause requires an unbiased and impartial decisionmaker. Thus, where the requirement of showing actual bias or prejudice under MCR 2.003(B)(1) has not been met, or where the court rule is otherwise inapplicable, parties have pursued disqualification on the basis of the due process impartiality requirement. *Crampton v Dep't of State*, 395 Mich 347; 235 NW2d 352 (1975), is the leading Michigan case addressing the constitutional basis for disqualification.[32] The *Crampton* Court stated:

---

[30] Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. . . . [Further], [n]ot establishing bias or partiality . . . are, expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display. [*Liteky* at 555-556.]

[31] The difficulty is that we live in an imperfect world. We therefore judge the actions and responses of a trial court in the light of the situation with which he is confronted. He stands in our eyes garbed with every presumption of fairness, and integrity, and heavy indeed is the burden assumed in this Court by the litigant who would impeach the presumption so amply justified through the years. [*Mahlen Land Corp v Kurtz*, 355 Mich 340, 350-351; 94 NW2d 888 (1959).]

[32] The defendant, Mr. Crampton, was arrested by a Lansing police officer for driving while intoxicated. The defendant refused to submit to a blood-alcohol test, the penalty for which results in the suspension or revocation of a person's driver's license. Subsequently, the defendant was served notice of suspension by the Secretary of State. The defendant then exercised his right to a hearing before the License Appeal Board. The

The United States Supreme Court has disqualified judges and decisionmakers without a showing of actual bias in situations where *"experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable."* Among the situations identified by the Court as presenting that risk are where the judge or decisionmaker

(1) has a pecuniary interest in the outcome;

(2) "has been the target of personal abuse or criticism from the party before him";

(3) is "enmeshed in [other] matters involving petitioner . . ."; or

(4) might have prejudged the case because of prior participation as an accuser, investigator, fact finder or initial decisionmaker. [*Id.* at 351 (citations omitted; emphasis added).]

This Court has examined the issue of judicial disqualification pursuant to the Due Process Clause and has found that disqualification for bias or prejudice is only constitutionally required in the most extreme cases.[33]

---

panel that presided over the defendant's hearing was comprised of a member of the Lansing police force. This Court held that the defendant was denied due process of law because "[a]ppeal board panels which are membered by fulltime law enforcement officials are not fair and impartial tribunals to adjudge a law enforcement dispute between a citizen and a police officer." 395 Mich 350.

[33] Our conclusion is based on federal disqualification cases. In *Tumey v Ohio*, 273 US 510, 523; 47 S Ct 437; 71 L Ed 749 (1927), the United States Supreme Court stated:

[I]t certainly violates the [Due Process Clause of the] Fourteenth Amendment . . . to subject [a person's] liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case.

However, the United States Supreme Court has also stated that

The test articulated in *Crampton* was extracted from the United States Supreme Court decision *Withrow v Larkin*, 421 US 35; 95 S Ct 1456; 43 L Ed 2d 712 (1975).[34] The *Withrow* Court stated:

> Concededly, a "fair trial in a fair tribunal is a basic requirement of due process." This applies to administrative agencies which adjudicate as well as to courts. Not only is a biased decisionmaker constitutionally unacceptable but "our system of law has always endeavored to prevent even the probability of unfairness." In pursuit of this end, various situations have been identified in which *experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.* [*Id.* at 46-47 (citations omitted; emphasis added).][35]

---

not "[a]ll questions of judicial qualification . . . involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion." [Citations omitted.] ("[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level"). [*Aetna Life Ins Co v Lavoie*, 475 US 813, 820; 106 S Ct 1580; 89 L Ed 2d 823 (1986). See also *Morris v Metriyakool*, 418 Mich 423, 437; 344 NW2d 736 (1984).]

In *Aetna*, the Court developed a "reasonable formulation" test that asks whether the "situation is one 'which would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true.'" 475 US 822 (citations omitted). Accordingly, the burden is heavy for a disqualification motion grounded on the constitutional right to an unbiased and impartial tribunal.

[34] *Withrow* involved the administrative board in charge of licensing physicians, and warning, reprimanding, or suspending physician licenses. The Court found no procedural due process violation where a physician examining board conducted an investigation, issued charges, and then sat as the decisionmaker at the hearing on the charges. Accordingly, like *Crampton*, *Withrow* takes place in the administrative agency setting.

[35] Because *Crampton* arose in an administrative agency context, the disqualification court rule (at that time GCR 1963, 912) was inapplicable, i.e., it only applied to "judges," as does the current court rule. The right to a fair hearing exists in the administrative setting just as it does in the courtroom. Accordingly, the *Crampton* decision developed out of the constitutional right to a fair hearing in front of an impartial decisionmaker. See, generally, *Ferrario v Escanaba Bd of Ed*, 426 Mich 353; 395 NW2d 195 (1986) (the board of education conducted a hearing into charges

*Crampton* sets forth specific examples of United States Supreme Court decisions that fall into the four listed categories.[36] Two of the four *Crampton* scenarios are implicated in the present case.

Situation 2 allows disqualification of a judge or decisionmaker who "has been the target of personal abuse or criticism from the *party* before him." *Id.* at 351 (emphasis added). The example cited in *Crampton* involved a situation in which a trial judge had been insulted, slandered, and vilified during trial by a defendant representing himself. The Supreme Court held that the trial judge should not adjudicate postjudgment contempt proceedings against the defendant. *Mayberry v Pennsylvania*, 400 US 455, 465-466; 91 S Ct 499; 27 L Ed 2d 532 (1971). However, the Court stated:

> It is, of course, not every attack on a judge that disqualifies him from sitting. . . . Many of the words leveled at the judge in the instant case were highly personal aspersions, even "fighting words"—"dirty sonofabitch," "dirty tyrannical old dog," "stumbling dog," and "fool." He was charged with running a Spanish Inquisition and told to "Go to hell" and "Keep your mouth shut." Insults of that kind are apt to strike "at the most vulnerable and human qualities of a judge's temperament." [Citations omitted.]

---

alleged against a teacher); *Morris v Metriyakool*, n 33 *supra* (medical malpractice arbitration panels).

[36] Importantly, we recognize the amorphous nature of the situations listed in *Crampton* as 1 through 4; therefore, an analysis of the examples given as illustrative of each particular situation is critical. These situations are not to be viewed as catch-all provisions for petitioners desiring disqualification. On the contrary, we find these situations to be factually specific on the basis of the examples given. Thus, we interpret the test and scenarios outlined in *Crampton* narrowly. However, this is not to say that the *Crampton* list is exclusive.

In *Mayberry*, the nature of the defendant's remarks necessarily required the judge to become "embroiled in a running, bitter controversy" with the defendant. *Id.* at 465. Thus, it would have been improper for the judge to adjudicate the defendant's contempt proceedings. *Id.* at 466. The facts of the present case do not rise to the level of those presented in *Mayberry*. See part VII(B).

Situation 3 listed in *Crampton* calls for the disqualification of the judge or decisionmaker in an instance where that individual is " 'enmeshed in [other] matters involving *petitioner*.' " 395 Mich 351, citing *Johnson v Mississippi*, 403 US 212, 215; 91 S Ct 1778; 29 L Ed 2d 423 (1971) (emphasis added). In *Johnson*, the United States Supreme Court found that a trial judge should be disqualified from adjudicating a defendant's contempt proceedings where the judge had revealed deep prejudice against the defendant's profession and, further, was recently a losing party in a civil rights suit brought by that individual. The United States Supreme Court stated:

> In concluding that Judge Perry should have recused himself, we do not rely solely on the affidavits filed by the lawyers reciting intemperate remarks of Judge Perry concerning civil rights litigants. Beyond all that was the fact that Judge Perry immediately prior to the adjudication of contempt was a defendant in one of petitioner's civil rights suits and a losing party at that. *From that it is plain that he was so enmeshed in matters involving petitioner as to make it most appropriate for another judge to sit. Trial before "an unbiased judge" is essential to due process.* [403 US 215-216 (emphasis added).]

Accordingly, this situation involved an actual previous lawsuit between the judge and the defendant before

him. Again, the situation in *Johnson* differs from that presented by the facts of this case. See part VII(B).

In the present case, the department has placed heavy reliance on the Court of Appeals decision in *Clemens v Bruce*, 122 Mich App 35; 329 NW2d 522 (1982). *Clemens* ineffectively interprets the disqualification standard articulated in *Crampton*. The plaintiffs in *Clemens* moved to disqualify the judge on the basis of personal bias against their attorney, who had filed a complaint against the judge with the Judicial Tenure Commission as a result of a dispute over the appointment of counsel for indigent criminal defendants.[37] Thus, it appears that the plaintiffs were alleging actual bias pursuant to the court rule. However, without an examination of disqualification law under the court rule, the Court of Appeals held that

> [t]he circumstances presented . . . fall within factors (2) and (3) of the test stated in *Crampton*. The circumstances suggested such a risk of actual prejudice on the part of the judge that due process required his disqualification even absent a showing of actual prejudice. . . . Our decision is not to be construed as suggesting that the trial judge was guilty of any actual impropriety. [122 Mich App 38.]

Aside from a repetition of the *Crampton* language, the Court of Appeals in the *Clemens* opinion gives little, if any, guidance regarding an interpretation of the listed situations calling for disqualification. The decision incorrectly refers to the *Crampton* scenarios as "factors," as if it is applying some sort of balancing

---

[37] The plaintiffs' motion was made pursuant to GCR 1963, 912.2(2).

test. We disagree with this characterization, because the *Crampton* scenarios are examples, not factors to be balanced. Moreover, the lack of insightful analysis in *Clemens* fails to aid this Court in its attempt to understand and apply the *Crampton* standard for disqualification. Accordingly, we find the department's emphasis and reliance on *Clemens* to be misplaced and find that decision to be without precedential value.

VI

OPINIONS DENYING THE DEPARTMENT OF CORRECTIONS'
MOTION TO DISQUALIFY

In determining the issue before us, we review the factual findings made by Chief Judge Houk for an abuse of discretion. Judge Houk accepted the version of events as related by Judge Giddings. Consequently, we defer to the factual findings and conclusions of both Chief Judge Houk's and Judge Giddings' opinions.[38] In their arguments to this Court, the plaintiffs and plaintiffs-intervenors have, for the most part, relied on the analysis presented in these opinions. Therefore, the plaintiffs and plaintiffs-intervenors' arguments will be addressed within this section.

As previously discussed, Judge Giddings' perception of what took place on September 12, 1994, at the in-chambers meeting is much different from that of Messrs. Govorchin and Soros. Judge Giddings correctly stated that MCR 2.003 requires a showing of actual bias or prejudice.[39] However, Mr. Govorchin

---

[38] However, we review de novo the applicability of the present facts to the relevant law.

[39] We infer that Judge Giddings was specifically referring to MCR 2.003(B)(1).

admitted that Judge Giddings has not prejudged the case, nor has he shown actual bias or prejudice.[40] Accordingly, because of the lack of any actual bias, the opinion states that the court rule has not been satisfied.

Judge Giddings rejected the department's arguments made under *Clemens*.[41] In response to the department's statement that Judge Giddings had become "sufficiently irritated with and has personal-

---

[40] This admission is significant for purposes of disqualification pursuant to MCR 2.003(B)(1). It is found in the transcript of the hearing on the motion for disqualification before Judge Giddings on September 29, 1994.

*The Court*: You would agree there is utterly no showing of any actual bias or prejudice, correct?

*Mr. Govorchin*: Under the Court's rulings, no.

*The Court*: None?

*Mr. Govorchin*: Right.

*The Court*: You agree that you cannot point to one instance, one instance where I said that some how [sic] I should not be criticized for my ruling just in terms of criticism. My objections have gone primarily, really exclusively, to miss—what I understood to be false and misleading statements about the Court's rulings. Correct?

*Mr. Govorchin*: That's my understanding.

*The Court*: And finally, not the least of which can you point to one single ruling in this case where I have made rulings in your favor, in favor of the Plaintiffs, I think I even made some helpful comments . . . on how the Department, not in non compliance with [this] Court's ruling, as to how we can resolve that and I did that in the presence of Counsel. . . . *Can you point to one, point to one instance, one single ruling with regard to any suggestion, any aspect of this case, not a media thing, that would reflect some prejudgment or bias on this Court's part?*

*Mr. Govorchin*: No, I don't think that has happened yet, that's why I'm pointing to the *Clemens* factors. . . . [T]he Court will remember I started out by saying *it isn't a demonstration of actual bias under MCR 2.003*. [Emphasis added.]

[41] The department has primarily relied on *Clemens* throughout the proceedings regarding this motion. We assume this is because *Clemens* involved a judge, whereas *Crampton* involved an administrative board. Because we limit the viability of *Clemens*, we address the department's arguments as if they had been made directly under *Crampton*.

ized his judicial response to the public statements of Governor John Engler," Judge Giddings stated:

> That is utterly false. A dispassionate examination of this Court's statements makes clear that this Court's ·concern has been directed to one thing and one thing only. That one thing is the accurate reporting of court proceedings. That is reflected in repeated statements made on and off the record by this Court.

> \*      \*      \*

> This record is barren of any indication of "irritation" or some "personalized" response to the Governor's or any public criticism.

Additionally, Judge · Giddings responded to the department's argument that it was inappropriate for him to make comments about the plaintiff's show cause petition. Judge Giddings stated, "[n]ot only does this Court have the right to examine into the sufficiency of allegations in support of a petition for show cause, the Court has a duty to do so."

> No matter how Defendant chooses to characterize the matter, the upshot of those discussions was that this Court refused to issue the requested Order to Show Cause [why Governor Engler and John Truscott should not be held in contempt] for several reasons. First, the petition was somewhat unclear and imprecise. Moreover, it included allegations against Mr. Truscott which the Court felt would accomplish little but to confuse the process. . . .

> What Defendant really objects to is the Court's suggestion that Plaintiff might want to focus on Engler's letter of August, 1994 to Attorney General Kelley. This, it is said by counsel for Defendant, demonstrates "the appearance of bias or prejudice" against Governor Engler. Assuming that to be true, it is of no consequence here. To the extent Engler may become involved in these proceedings in the

future, this judge would not be presiding at such proceedings.

At this point, Governor Engler is not a party to these proceedings. Nor is he personally affected by them.

Judge Giddings clearly stated that he does not consider the Governor to be a party to the *Cain* case. Even under the *Clemens* (i.e., *Crampton*) standard for disqualification, the bias or prejudice must involve a party. Therefore, Judge Giddings concluded that both of the *Clemens* situations 2 and 3 are inapplicable.

In response to the Governor's August 12 letter to Attorney General Kelley, Judge Giddings set forth reasons for the delay in this case.

[T]he most recent trial adjournment occurred because the Department is in default. This is the second time the Department has been defaulted. The trial was also adjourned because discovery had been delayed by the Department's failure to comply with the court rules regarding discovery. Moreover, numerous contempt proceedings have been brought against the [Department of Corrections] and the Department has been held in contempt on six different occasions.

Accordingly, it appears that the department is in part responsible for the delay in this case.

Lastly, Judge Giddings characterized his actions at the September 12 conference as follows:

The Court did suggest that Plaintiffs clarify their petition and be more specific. This Court also tried to discourage Plaintiffs from proceeding against Press Secretary Truscott. *True, this Court did suggest (not demand or even request) a contempt proceeding against the Governor based on the August 12th letter.* The suggestion, however, is appropriate

in light of MCL 600.1701(10);  MSA 27A.1701(10)[42] and in
light of the Canons of Ethics[43] and Michigan case
law . . . . [Emphasis added.]

Judge Giddings' decision denying the disqualification
motion was affirmed by Chief Judge Houk in his opin-
ion dated October 7, 1994. In his opinion, Judge Houk
supported the analysis and conclusion reached by
Judge Giddings.[44]

---

[42] MCL 600.1701(10);  MSA 27A.1701(10),  now MCL 600.1701(l);  MSA
27A.1701(l),  is the contempt statute that makes it a crime to publish
"false or grossly inaccurate" reports of court proceedings.

[43] Specifically, Judge Giddings is referring to Canon 3A(6),  which per-
mits the judge to explain his "holdings or actions."

[44] The chief judge conducted a de novo review and held that, under the
facts presented by the department, disqualification of Judge Giddings was
not required. Chief Judge Houk stressed that counsel for the department
was unable to point to a single ruling or event that prejudiced the depart-
ment. Further, the department has not sought to remove Judge Giddings
from other cases in which it is a party. In fact, Mr. Govorchin had
acknowledged that most of Judge Giddings' rulings were favorable to the
department.

Chief Judge Houk stated that the department "failed to discharge its
'heavy burden' and demonstrate 'actual prejudice' . . . ." Furthermore,
the department failed to meet the test articulated in *Clemens* and *Cramp-
ton*. He based his conclusion on the fact that Mr. Govorchin acknowl-
edged that he was unable to show any actual bias against his client. Fur-
ther, none of the *Clemens* "factors" were present. Lastly, many of the
asserted matters had become stale.

Chief Judge Houk did not accept the version of events presented by
Messrs. Govorchin and Soros, because their recollections did not comport
with those of the others present at the meeting. Rather, Chief Judge Houk
accepted the version of events as related by Judge Giddings himself, attor-
ney Charlene Snow, and the prisoner litigants. The fact that the plaintiffs'
show cause motion changed from its initial form shows no more than
compliance with the judge's comments at that meeting.

Finally, Chief Judge Houk responds to the department's primary conten-
tion that because Judge Giddings harbors ill feelings against the Governor,
these feelings have ripened into bias against the department. The Chief
Judge stated:

[A] system that rewards attacks upon a judge by the champion of
a party by requiring the judge's recusal where the judge's response
has been authorized by law, and not publicly advanced by the court

## VII

### ANALYSIS

After a thorough review of the entire record in this case, this Court is of the opinion that disqualification of Judge Giddings is not required. Therefore, we reverse the Court of Appeals decision requiring disqualification and remand to the trial court for swift, fair, and accurate resolution.

The Court of Appeals, without conducting oral argument or reviewing the complete lower court record, particularly the transcripts of the hearings on the motion to disqualify, peremptorily reversed the decisions of Chief Judge Houk and Judge Giddings. The pertinent portions of the Court of Appeals one-page order are as follows:

> The lower court abused its discretion in denying the motion to disqualify Judge James R. Giddings. *The record clearly demonstrates actual bias on the part of the trial judge thereby mandating disqualification.* MCR 2.003.
>
> Further, the *procedural due process guarantees* of the Michigan and the United States Constitutions *require disqualification* under these circumstances. *Crampton v Dep't of State,* 395 Mich 347, 351; 235 NW2d 352 (1975); *Clemens v Bruce,* 122 Mich App 35; 329 NW2d 522 (1982).
>
> The record reveals that the trial judge has become personally enmeshed in the prosecution of this claim. At a time when the trial judge considered the Governor of the State of Michigan and defendant Department of Corrections to be

can only result in forum shopping that will ultimately destroy the independent judiciary that all State Officers are sworn to uphold. This is particularly true where counsel does not demonstrate actual bias or prejudice against the party.

Accordingly, Chief Judge Houk denied the department's motion to disqualify Judge Giddings from this matter.

a single entity, the judge personally filed a grievance with the Attorney Grievance Commission against the Governor based upon the Governor's criticisms of the trial judge's rulings. Thereafter, the trial judge advised plaintiff's counsel how to most effectively proceed with a motion to hold the Governor in contempt of court.

Under the circumstances of this case, this Court concludes that the trial judge has abandoned his essential role of a neutral and detached judicial officer. [Unpublished order, entered December 1, 1994 (Docket No. 179431) (emphasis added).]

### A. NO SHOWING OF ACTUAL BIAS OR PREJUDICE

This Court disagrees with the Court of Appeals decision that the department succeeded in showing that Judge Giddings has demonstrated actual bias or prejudice against it. There has been no such showing of actual bias or prejudice as required by MCR 2.003(B)(1).[45] This conclusion is primarily based on Mr. Govorchin's admission of no actual bias, see n 40, as well as the lack of evidence to indicate bias throughout the record.

---

[45] In his concurrence, Chief Justice BRICKLEY suggests that by focusing on subsection (B)(1) of the court rule, we are "restrain[ing] disqualification to situations that happen to be accurately reflected in an example." *Post* at 519-520. Chief Justice BRICKLEY states that "[i]nstead, [he] would disqualify [a] judge if [he] determined, with reference to the examples, that [the] judge could not in fact impartially hear a case." *Id.* at 520. That which the concurrence urges, we do. Specifically, we recognize the nonexclusive nature of the list of situations set forth in MCR 2.003(B). However, in answering the disqualification question we have focused on subsection (B)(1). Because the department has alleged actual bias on the part of Judge Giddings and the Court of Appeals has found such bias, we find it absolutely necessary to address the question concerning actual bias. Therefore, we are required to apply subsection (B)(1) of the court rule. We do not agree that our application of MCR 2.003(B)(1) has the effect of restraining the number of situations that call for disqualification of the trial judge.

Furthermore, pursuant to a literal reading of the court rule, disqualification is simply not required on the basis of these facts. The fact of the matter is that the Governor of this state is not a party to this action, nor was he ever a party to this action. Although the department argues that Judge Giddings considered the Governor to be a party, Judge Giddings never declared him to be so.[46] In fact, after reviewing the record, this Court finds that Judge Giddings was hesitant to include the Governor within the scope of the media contacts order, but did so because the Governor, at that time, was purporting to speak with authority on the subject of *Cain v Dep't of Corrections*.[47] However, Judge Giddings never declared the Governor to be a party to this lawsuit.

It did not escape our attention that the plaintiffs and plaintiffs-intervenors have presented inconsistent arguments regarding the status of the Governor in relation to this case. They argue that the Governor is not a party for purposes of the *Crampton* theory of disqualification. Yet, they also argue that the Governor is a party for purposes of amenability to the orders issued by the court.

Coincidentally, the dissent presents the mirror image of the inconsistent argument advanced by the plaintiffs and the plaintiffs-intervenors. The dissent

---

[46] Even if the department were correct in its assertion that in the judge's mind, the Governor was a party to this lawsuit, this would not change the fact that, in reality, the Governor was not a party. The court rule does not allow for such a loose interpretation of the term "party."

[47] As stated in n 22 *supra*, the propriety of Judge Giddings' ruling regarding the Governor is pending in the Court of Appeals. Whether the decision to include the Governor within the scope of the media contacts order was proper has no bearing on the issue of disqualification presented here.

would impose a test for determining who constitutes a "party" under MCR 2.003(B)(1) that is dependent on the trial judge's subjective beliefs. Without any support for its contention, the dissent states that "the judge's perception" is the touchstone for determining disqualification questions. *Post* at 528. Apparently, the dissent wishes to implement a two-pronged subjective inquiry. First, in determining who is a "party" for purposes of MCR 2.003(B)(1), the dissent contends that we must look to the judge's perception. Second, in determining whether the trial judge is personally biased or prejudiced, the dissent contends that we must again step inside the mind of the judge. The dissent fails to set forth any support for either of these contentions. Conversely, the federal statutes employ an objective standard for determining the bias or prejudice prong of the disqualification analysis. See n 48. We find the federal objective test to be a sound approach to disqualification motions brought pursuant to MCR 2.003(B)(1).

Under the dissent's proposed definition, a "party" for purposes of MCR 2.003(B)(1) is anyone whom the judge perceives to be a party. Under this analysis, which requires this Court to examine the judge's subjective beliefs, the dissent impliedly concludes that Governor Engler is a party to the *Cain* litigation. Therefore the dissent explicitly concludes that the department is thereby precluded from receiving a fair trial of this matter.

However, the dissent's argument, if followed to its logical conclusion, would subject the Governor to the orders and contempt powers of the trial court in this case. Surely, the dissent would not stand for such a result. Like the plaintiffs and the plaintiffs-

intervenors, the dissent cannot manipulate the present situation so as to achieve its desired, albeit inconsistent, result. If the Governor is deemed a party by virtue of Judge Giddings' alleged beliefs or perceptions as the dissent proposes, then the Governor would be subject to the orders set forth by the judge and is further amenable to the judge's contempt powers. It is that simple.

We prefer an alternate course to that suggested by the dissent. Specifically, we employ a commonsensical and literal reading of the court rule in reaching the conclusion that the Governor is not a party to this case. Moreover, we believe that imposing a subjective test for determining a "party" will only create confusion in disqualification and other situations involving a "party."

In order for disqualification pursuant to MCR 2.003(B)(1) to be proper, the judge must have shown actual bias against a *party* or a party's attorney. Because the bias in this case was between the judge and a nonparty, the requirements of MCR 2.003(B)(1) have simply not been met. Moreover, this Court would like to stress that the record reveals a mutual respect between Judge Giddings and the attorneys for the department. Clearly, the Court of Appeals was wrong when it held that Judge Giddings demonstrated actual bias against the department.[48]

---

[48] It appears that the department has pursued its motion on the basis of the appearance of impropriety. This is the phraseology of one of the standards adopted by the federal courts, found at 28 USC 144 and 28 USC 455. "Under both statutes, recusal is appropriate where 'a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'" *Yagman v Republic Ins*, 987 F2d 622, 626 (CA 9, 1993) (citations omitted). See also *Liljeberg v Health Ser-*

Additionally, there has been no showing that the alleged bias or prejudice is "personal" as required by MCR 2.003(B)(1). The department has challenged actions on the part of Judge Giddings that took place within the confines of this lawsuit. It has not alleged that the bias stems from some extrajudicial source. We find the United States Supreme Court decision in *Liteky, supra,* to be instructive with respect to our application of MCR 2.003(B)(1). Accordingly, the department has failed to persuade us that Judge Giddings' alleged animosity toward the Governor or his actions at the September 12 in-chambers conference are such that he has displayed a "deep-seated favoritism" for the plaintiffs (or the plaintiffs-intervenors) or "antagonism" for the department to the extent that fair judgment is rendered impossible in this case.[49]

---

*vices Acquisition Corp,* 486 US 847; 108 S Ct 2194; 100 L Ed 2d 855 (1988).

Pursuant to the federal statutes, "recusal will be justified either by actual bias or the appearance of bias." *Yagman, supra,* 987 F2d 626. These statutes afford more protection to parties than does the constitution. Thus, the federal "appearance of impropriety" standard of § 455(a) is not the standard for disqualification under due process. See *United States v Wade,* 931 F2d 300, 304, n 5 (CA 5, 1991); *United States v Couch,* 896 F2d 78 (CA 5, 1990).

We acknowledge there may be situations in which the appearance of impropriety on the part of a judge or decisionmaker is so strong as to rise to the level of a due process violation. However, this case does not present such a situation. After reviewing the lower court record, we find that the actions of Judge Giddings do not constitute a deprivation of the department's due process guarantee of an unbiased and impartial decisionmaker.

[49] The similarities between the requirements of MCR 2.003(B)(1) and 28 USC 455(b)(1), provide access to a body of federal disqualification case law to which this Court may look for guidance. The following cases involve situations like the present case in which the alleged judicial bias or animus was directed not toward the party desiring disqualification, but toward someone who was in someway connected to that party. See *In re City of Detroit,* 828 F2d 1160 (CA 6, 1987). In *People Helpers Foundation v Richmond, Va,* 12 F3d 1321 (CA 4, 1993), the district judge was not per-

B. THE *CRAMPTON* STANDARD FOR DISQUALIFICATION

Pursuant to *Crampton,* the question is whether the present situation is one where "experience teaches that the probability of actual bias . . . is too high to be constitutionally tolerable." 395 Mich 351. Analysis of disqualification issues under *Crampton* requires a case-by-case determination of when the risk of actual bias is too prevalent, so that the constitutional guarantee of a fair trial would be inhibited. As stated in n 33, the constitutional standard for disqualification is not easily met. We stress that it is only through an examination of the four listed scenarios and their concomitant examples that the "experience teaches" test articulated in *Crampton* is rendered meaningful. See n 36.

We find that Judge Giddings' apparent conflict with the Governor is not a proper basis for disqualification under the test or the scenarios articulated in *Cramp-*

sonally biased against the City of Richmond in a suit brought against the city for violation of the fair housing act. That the judge voiced his perceptions concerning the case and made comments that allegedly demonstrated his negative feelings about the conduct of a former city council member, were insufficient to show a personal bias against the city.

Generally, the federal cases discussing disqualification for actual personal bias under § 455(b)(1), indicate that these motions are rarely granted. For example, see *Yagman v Republic Ins,* n 48 *supra.* In *Yagman,* the district judge sat as the adjudicator in a previous heated defamation trial in which Mr. Yagman served as an attorney for the plaintiff. On appeal, the judge's imposition of sanctions on Mr. Yagman was vacated and the case was reassigned to preserve the appearance of justice. The district judge did not reassign the case as directed, which then prompted the Ninth Circuit Court of Appeals to issue a writ of mandamus ordering reassignment. In response, the judge unsuccessfully petitioned for certiorari to the United States Supreme Court. Subsequently, in a different case, Mr. Yagman sought recusal of the same judge on the basis of the events of the previous lawsuit. The Ninth Circuit Court of Appeals held that the events of the previous case, which involved heated conflicts between the judge and Mr. Yagman, were insufficient to prove actual or even apparent bias in the latter case.

*ton.* A narrow reading of *Crampton* leads us to conclude that the facts of this case are unquestionably distinguishable from those situations listed in *Crampton.*

First, Judge Giddings was not the target of personal abuse by a party before him, as was the judge in *Mayberry.* See part V(B).[50] Rather, the comments were made by the nonparty Governor who at that time was at the height of his campaign for reelection. We find it most unfortunate that Judge Giddings failed to recognize and insulate himself from the political climate in which he was operating at the time.[51] However, it is this Court's belief that with the passage of time, so comes the cooling of tempers and the cooling of rhetoric. What was once a very hot climate surrounding this case has now become considerably cooler. Accordingly, the remarks made some time ago are not likely to resurface. Furthermore, "[t]he mere fact that a judge has been subjected to press criticism in connection with a case or a party does not necessarily require the judge's disqualification." *Illinois v Cole-*

---

[50] In *Mayberry,* degrading comments were made by a party directly to the judge in the courtroom setting. The United States Supreme Court found that it would therefore be improper for that judge to adjudicate the party's contempt proceeding arising as a result of the abusive comments.

[51] The following passage from *Mahlen Land Corp,* n 31 *supra* at 350, continues to be appropriate and wise advice for trial judges to follow.

> We would desire that all trial courts be irreproachable in patience, tact, wisdom, and courtesy, not only learned in the law but impervious to the vexations and irritations that plague the rest of mankind.

Additionally, the following advice offered by the United States Court of Appeals for the Third Circuit is instructive: "[B]y training and inclination, judges meet media criticism of their actions with robust insensitivity." *United States v Martorano,* 866 F2d 62, 69 (CA 3, 1989).

*man,* 168 Ill 2d 509, 541; 660 NE2d 919 (1995).[52] The Governor is not the department, just as the department is not the Governor. This Court is confident that the department will not be denied a fair trial of this matter.

Second, unlike the judge in *Johnson, supra,* Judge Giddings is not enmeshed in other matters involving the department or other parties to this case.[53] This Court finds that the struggle between the Governor and Judge Giddings does not rise to the level of being "enmeshed" as set forth in *Crampton.* See part V(B). Judicial officers should resist the temptation to enter into public political discussions with candidates for public office. However, this Court recognizes the ability of individual judges to file requests for investigation with the Attorney Grievance Commission pursuant to the Michigan Rules of Professional Conduct.[54]

Moreover, on the basis of the facts of this case, we understand Judge Giddings' concern regarding the accuracy of the statements made to the press. Cognizant of the fact that the propriety of Judge Giddings' allegedly overbroad media contacts order is not before us, it must be remembered that trial judges are human and they do make mistakes. However, the

[52] Prior written attacks upon a judge are . . . legally insufficient to support a charge of bias or prejudice on the part of a judge toward an author. [*United States v Bray,* 546 F2d 851, 858 (CA 10, 1976).]

[53] Again, *Johnson* involved a situation in which the judge was involved in previous litigation with a party. Furthermore, like *Mayberry,* the judge held the party in contempt and, thus, was not allowed to adjudicate those proceedings.

[54] Furthermore, requests for investigation into an attorney's behavior are more appropriately instigated at the completion of the litigation, in circumstances where the challenged behavior is related to the litigation before the judge.

remedy for mistakes made by trial judges lies in the appellate process, not in motions to disqualify. Therefore, we do not think that Judge Giddings' vigorous attempt to regulate the accuracy of statements made to the press is a sound basis for his disqualification.

Additionally, we do not find that Judge Giddings' actions at the September 12, 1994, in-chambers meeting warrant his disqualification. In reaching this conclusion, we choose to defer to the findings of both Judge Giddings and Chief Judge Houk. See pp 504-507.[55] Particularly, we accept Judge Houk's decision regarding the events that took place during that meeting. This is not only a class action, it is a class action involving a class of prisoners who are proceeding in propria persona. Therefore, the nature of this lawsuit dictates that the judge assume a more active role than he would in ordinary day-to-day civil litigation. Accordingly, we find that Judge Giddings' advice to the plaintiffs appearing in propria persona regarding the structure of their motion was appropriate.

This Court is less certain about the propriety of Judge Giddings "suggestion" that the August 12 letter from the Governor to Attorney General Frank Kelley was an alternative ground for a contempt motion. Nonetheless, defense counsel did not object at that

---

[55] Public policy reasons also support a reversal of the disqualification order in this case. See *Kolowich v Ferguson*, 264 Mich 668, 670; 250 NW 875 (1933). This Court stated:

> We accept the statement of the circuit judge that he has no bias or prejudice and can accord defendant a fair trial. Unless the fact of prejudice or bias is established or the necessities of justice to the defendant require it, a change of judge is an unjustifiable wrong to the public for it works delay, entails expense, and endangers the prosecution.

time, nor were any objections made at the hearing following that in-chambers meeting. Each of the events challenged by the department, even when viewed together, do not amount to the judge being enmeshed in other matters to the extent that disqualification is required.

VIII

CONCLUSION

Having concluded that the disqualification of Judge Giddings was erroneously ordered by the Court of Appeals, we reverse and remand this case for immediate scheduling of trial. After nearly eight years of pretrial litigation, this Court is convinced that the resolution of this case must be accomplished fairly and expeditiously. We expect not only the swift resolution of this case, we further expect that the parties and the court will engage in the appropriate good will so that resolution will be an easier task. In conformance with our directive of swift resolution, we order the trial court judge to investigate, with the state's Attorney General, the advisability of the appointment of a special counsel to represent the class of male prisoner plaintiffs who have thus far proceeded in propria persona. We further order that the court and the parties prepare an expedited calendar for scheduling purposes and that the court submit to this Court a report indicating the dates set for trial in this matter.

We do not retain jurisdiction.

LEVIN, CAVANAGH, and BOYLE, JJ., concurred with MALLETT, J.

BRICKLEY, C.J. (*concurring*). While I agree with the majority's conclusion that Judge Giddings should not

be disqualified from hearing the underlying suit, I write separately because the conflict between the majority and the dissent over whether the Governor is a "party" to this suit threatens to overwhelm thoughtful resolution of the actual issue in this case— whether the conduct of the Governor and Judge Giddings requires Judge Giddings' disqualification from the *Cain* litigation.

The Court's struggle to define the Governor's relationship to the suit is understandable. The relationship between a governor and a department is difficult to define because it is unique. On the one hand, the State Constitution vests in the Governor broad powers over the departments of state. See, e.g., Const 1963, art 5, §§ 2, 3 and 8. On the other hand, we do not expect the Governor, as a practical matter, to be responsible for the day-to-day operations of the departments, including most litigation. This particular relationship renders any attempt to decide whether the Governor is a "party" to litigation between a department and a third party a frustrating and divisive task at best.

At worst, this attempt distracts this Court's attention from the disqualification issue. The court rule disqualifies a judge from hearing the underlying litigation when the "judge cannot impartially hear a case . . . ." MCR 2.003(B). By focusing on subsection (B)(1) of the court rule, the majority and the dissent ignore the broader mandate of the court rule in favor of an example of when a "judge cannot impartially hear a case."[1] I would not restrain disqualifica-

---

[1] I recognize that the parties have phrased this issue in terms of subsection (B)(1), but I see no compelling reason to similarly limit our discus-

tion to situations that happen to be accurately reflected in an example. Instead, I would disqualify this judge if I determined, with reference to the examples, that this judge could not in fact impartially hear a case.

Under the facts before this Court, I agree with the majority that Judge Giddings can impartially hear the *Cain* litigation. The facts show that Judge Giddings aided a plaintiff in propria persona by recommending substantive additions to plaintiff's show cause motion—in chambers in the presence of opposing counsel. Such an action is consistent with the judge's separate power to "properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity . . . ." Code of Judicial Conduct, Canon 3A(8).

Additionally, in the present case Judge Giddings could have filed the show cause order himself. See MCR 3.606 and MCL 600.1701(g); MSA 27A.1701(g). Where the judge could have filed the show cause order, I find nothing improper in the judge's decision to aid a plaintiff in propria persona to accomplish the same objective. Either under the facts as stated by the plaintiffs or under the facts propounded by defendants, nothing regarding Judge Giddings' conduct in camera, standing on its own, suggests that Judge Giddings cannot in fact impartially hear the *Cain* litigation.

I reach the same conclusion when viewing the proceedings in camera in light of Judge Giddings' June 2 and 30, 1994, media contact orders. Without com-

---

sion of the underlying motion to disqualify, especially when such a limitation confuses the underlying issue.

menting on whether the orders were a mistake of law, I recognize that, even if the orders did exceed Judge Giddings' authority, he made a legal mistake. The remedy for a legal mistake is the appellate process, not a motion to disqualify.

If anything, viewing the proceedings in camera in the context of the media contact orders emphasizes the propriety of these proceedings. Because Judge Giddings acted under the assumption that the Governor violated a court order, filing a motion to show cause is not out of the ordinary. The facts simply do not suggest that Judge Giddings cannot impartially hear the *Cain* litigation.

I also agree that the facts of this case do not harmonize with those situations that require due process disqualification. I agree with the majority's interpretation of due process case law. I agree that the citations of United States Supreme Court cases in this Court's *Crampton* decision frame the discussion of whether a particular fact situation rises to the level of a due process issue. *Crampton v Dep't of State*, 395 Mich 347; 235 NW2d 352 (1975).

However, I do not agree with the majority's application of the due process case law to these facts. As in my analysis of the Court Rule, I would not base a ruling on a "yes or no" analysis of whether the Governor was a "party" to the suit. Instead, I would prefer to recognize that the Governor was, in some manner, connected to this suit. The task in ruling on a motion to disqualify is to decide whether that connection was close enough, and if the conduct was outrageous enough, that the situation suggests that the probability of actual bias is great enough to counsel in favor of disqualification.

However, even assuming the Governor's connection to the Department of Corrections was close enough, and that the Governor's conduct was outrageous enough, the Due Process Clause does not require disqualification in this circumstance. To make this point, I will review the second and the third situations listed in *Crampton.*

The second situation listed in *Crampton* requires disqualification if the judge " 'has been the target of personal abuse or criticism from the party before him.' " *Id.* at 351. This Court explained this statement by discussing the United States Supreme Court case of *Mayberry v Pennsylvania,* 400 US 455; 91 S Ct 499; 27 L Ed 2d 532 (1971). *Crampton,* 395 Mich 352. *Mayberry* holds that, when a judge has been such a target, the judge should be disqualified from hearing postjudgment contempt proceedings. *Mayberry* does not disqualify a judge from continuing to hear the underlying case, the case during which the judge was targeted. *Mayberry,* 400 US 465-466. See also *Taylor v Hayes,* 418 US 488, 501-503; 94 S Ct 2697; 41 L Ed 2d 897 (1974). Because all the parties agree that Judge Giddings would not preside over a contempt hearing against the Governor, I cannot conclude that *Crampton*'s second situation compels Judge Giddings' disqualification from the underlying *Cain* litigation.

The third situation listed in *Crampton* requires disqualification if the judge is " 'enmeshed in [other] matters involving petitioner . . . .' " *Crampton,* 395 Mich 351 (bracketing in the original). *Crampton* explained this statement by discussing the United States Supreme Court's case of *Johnson v Mississippi,* 403 US 212; 91 S Ct 1778; 29 L Ed 2d 423 (1971). In *Johnson,* the judge was disqualified from

adjudicating a courtroom observer to be in contempt for actions occurring in the judge's courtroom because the judge had just been a losing defendant in a separate civil rights suit involving the same observer. 403 US 215-216. Therefore, I interpret the third *Crampton* situation as disqualifying a judge when the judge is enmeshed in other matters, separate from the underlying litigation, involving a petitioner. Otherwise, a party in a case could disqualify a judge simply by attacking the judge in the context of the underlying litigation until the judge became enmeshed in the situation created by the attacks.

Applying this interpretation of *Crampton* to the present facts, I conclude that Judge Giddings was not enmeshed in other matters, separate from the underlying litigation, involving the Governor. All the challenged activity on the part of the Governor and on the part of Judge Giddings took place during, and concerned, the underlying *Cain* litigation.

In conclusion, the majority's and the dissent's debate over whether the Governor was a party to this litigation obscures the essential issue. Under the court rule, the essential issue is whether the judge can impartially hear the case. Nothing in the facts before the Court suggests that Judge Giddings cannot. Under the Due Process Clause, the essential issue is whether "experience teaches that the probability of actual bias on the part of the judge . . . is too high to be constitutionally tolerable." *Crampton*, 395 Mich 351, quoting *Withrow v Larkin*, 421 US 35, 47; 95 S Ct 1456; 43 L Ed 2d 712 (1975). Nothing about these facts leads me to conclude that there is sufficient appearance of bias to recommend disqualification.

Therefore, I agree with the result reached by the majority.

Levin, Cavanagh, and Boyle, JJ., concurred with Brickley, C.J.

Riley, J. (*dissenting*). I would affirm the Court of Appeals decision holding that Judge Giddings should be disqualified from further participation in this case. Therefore, for the reasons set forth following, I respectfully dissent.

I am persuaded that Judge Giddings is unable to impartially decide this case consistently with *Crampton v Dep't of State*, 395 Mich 347; 235 NW2d 352 (1975), or MCR 2.003. I believe Judge Giddings should be disqualified under *Crampton* because he has become " 'enmeshed in [other] matters involving petitioner,' "[1] and is " 'the target of personal abuse or criticism from the party before him . . . .' "[2] Furthermore, Judge Giddings has demonstrated that he is personally biased against the Department of Corrections and should be disqualified pursuant to MCR 2.003(B)(2).[3] Accordingly, I am persuaded that Ingham Circuit Court Chief Judge Peter D. Houk abused his discretion in denying defendant's motion to disqualify Judge Giddings and that the decision of the Court of Appeals should be affirmed.

---

[1] *Id.* at 351, quoting *Johnson v Mississippi*, 403 US 212, 215; 91 S Ct 1778; 29 L Ed 2d 423 (1971).

[2] *Id.* at 351, quoting *Withrow v Larkin*, 421 US 35, 47; 95 S Ct 1456; 43 L Ed 2d 712 (1975).

[3] MCR 2.003(B)(2) was changed to MCR 2.003(B)(1), effective September 1, 1995.

I

The Department of Corrections filed a timely
motion to disqualify Judge Giddings on Septem-
ber 26, 1994. Judge Giddings denied defendant's
motion by opinion dated September 30, 1994. Pursu-
ant to MCR 2.003(C)(3)(a), the motion was referred
to Chief Judge Houk, who reviewed the matter de
novo and affirmed Judge Giddings' decision.[4] Thereaf-
ter, the Court of Appeals granted immediate consider-
ation and held that the lower court abused its discre-
tion in denying Judge Giddings' disqualification.[5] I
believe the standard of review for this Court is also
abuse of discretion. Accordingly, the Court must
defer to findings of fact made by Chief Judge Houk,
including his refusal to accept defense counsels'
account of the in-chambers exchange.[6] The Court is,
therefore, bound to analyze the merits of defendant's
claim on the basis of Judge Giddings' account of the
in-chambers exchange.[7]

I disagree, however, with the chief judge that
acceptance of Judge Giddings' account of the in-

---

[4] See *People v Bero*, 168 Mich App 545, 549; 425 NW2d 138 (1988); *Peo-
ple v Upshaw*, 172 Mich App 386, 389; 431 NW2d 520 (1988).

[5] The Court of Appeals has consistently reviewed such decisions of the
lower court for abuse of discretion. See *People v Houston*, 179 Mich App
753, 755; 446 NW2d 543 (1989); *Czuprynski v Bay City Judge*, 166 Mich
App 118; 420 NW2d 141 (1988), and progeny.

[6] In his opinion, Chief Judge Houk stated:

*For this motion to be successful* this Court would have to accept
Messrs. Govorchin's and Soros' recitation of the facts of the Sep-
tember 12, 1994, meeting. The Court does not. They do not com-
port with the recollections of any other persons present. Judge Gid-
dings, attorney Charlene Snow, and the prisoner litigants who were
present all have a markedly different recollection of what occurred.
[Emphasis added.]

[7] See Judge Giddings' account *ante* at 491.

chambers exchange is fatal to the Department of Corrections' motion for disqualification.[8] According to Judge Giddings' September 30, 1994, opinion denying defendant's motion to disqualify: "This Court has little disagreement with the summary of the in-chambers discussions and other events described" in defendant's brief in support of the motion to disqualify. The facts of this case, as conceded by Judge Giddings and applied to the law in this state, warrant Judge Giddings' disqualification.

II

I agree with much of the majority's conscientious analysis of the law of disqualification. The Court of Appeals has traditionally analyzed judge-disqualification cases separately under the court rule and *Crampton*. *Crampton* is broader than the court rule because it specifically obviates the requirement of actual bias in cases in which a litigant's due process guarantees are violated. I agree with the majority that *Crampton* is best interpreted as setting forth a nonexhaustive list of situations in which a judge cannot impartially hear a case. This analysis is more appropriately deemed an alternative to, rather than an extension of, the court rule.[9] See *Wayne Co Prosecutor v Parole Bd*, 210 Mich App 148, 155; 532 NW2d 899 (1995).[10] Accordingly, defendant's motion to disqualify Judge Giddings should be analyzed separately under

---

[8] See n 6.

[9] *Crampton* does not reference GCR 1963, 912, the rule on which MCR 2.003 is based.

[10] However, [actual prejudice] is not required in situations where experience teaches us that the possibility of actual bias is too high to be constitutionally tolerable . . . . [*Id.*]

the court rule and the *Crampton* standard of due process.

A

I am persuaded that Judge Giddings should be disqualified on the basis of the due process analysis enunciated in *Crampton. Crampton* held that a basic requirement of due process is a "hearing before an unbiased and impartial decisionmaker . . . ." *Id.* at 351. Relying on *Withrow v Larkin*, 421 US 35, 47; 95 S Ct 1456; 43 L Ed 2d 712 (1975), the Court held that proof of actual bias *is not necessary* if " 'experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.' " *Crampton, supra* at 351. *Crampton* then set forth a nonexclusive list of potential situations in which the probability of actual bias exists sufficient to require the judge's disqualification. The judge:

(1) has a pecuniary interest in the outcome;

(2) "has been the target of personal abuse or criticism from the party before him";

(3) is "enmeshed in [other] matters involving petitioner . . ."; or

(4) might have prejudged the case because of prior participation as an accuser, investigator, fact finder or initial decisionmaker. [*Id.* at 351.]

I believe situations two and three warrant this judge's disqualification.

I initially note that both of the applicable *Crampton* situations presuppose the involvement of a "party" or "petitioner." *Id.* Although the Governor was not a party to this action, Judge Giddings insisted that

he was a party. The judge persistently unified the interest of the department and the Governor without a rational basis and over repeated objections of the department's counsel. The judge continually rejected defense counsel's suggestion that there was no unity of interest between the Department of Corrections and the Governor.[11]

For purposes of disqualification, the Court must focus on the judge's perception. Because the judge objectively demonstrated his erroneous belief that the Governor was a party and acted consistently with that belief, it obviously affected the department's interest.[12] My conclusion that the judge determined that the Governor was a party is not merely subjective, but clearly supported by uncontroverted statements on the record. The dissent does not conclude, contrary to the majority's assertion, that the Governor was a party to this litigation. He was *never* a litigant.

---

[11] At a hearing on November 23, 1993:

> *Mr. Govorchin*: I wouldn't think so. That's why I'm not sure why you're involved with this and why I'm involved with this. If the Governor's office decided to say something, they're not a party to this case. This is the Department of Corrections.
>
> *The Court*: As a matter of fact, the state is one entity. I was not aware that the Department of Corrections is a separate legal entity from other state agencies.

Judge Giddings even referred to Governor Engler as a party at the November 23, 1993, hearing. "Does this Court have or is this Court restricted from controling [sic] the behavior of a *litigant* that tells untrue statements about the status of this case."

[12] The majority misses the point in this regard, asserting that even if Judge Giddings believed that the Governor was a party, he was not in fact a party and the "court rule does not allow for such a loose interpretation of the term 'party.' " *Ante* at 510, n 46. The majority fails to recognize it is the judge's *perception* that Governor Engler is a party that gives rise to the prejudice against the department and, hence, the applicability of the court rule and *Crampton*.

It was Judge Giddings who *repeatedly* stated on the record that the Governor *was* a party and acted consistently with that belief in his continual pursuit of the Governor. This in no way suggests that the Governor was ever a party in fact. Furthermore, the majority has incorrectly characterized the dissent's discussion as an attempt to "manipulate" the status of the Governor in this lawsuit. The dissent has only illuminated how *Judge Giddings manipulated* the *Cain* litigation to obtain control over the Governor to the prejudice of the department.

In fact, the department was prejudiced by the judge's determination that Governor Engler was a party because the department then became responsible to "represent" a nonparty.[13] At several of the hearings, the department's attorney was unable to determine what interests he represented, clearly prejudicing the department's ability to construct its defense. This was complicated by Judge Giddings' ruling on the morning of September 30, 1994. On that day, Judge Giddings released his opinion on the issue of disqualification, declaring abruptly and without explanation that the Governor was not a party:

> At this point, Governor Engler is not a party to these proceedings. Nor is he personally affected by them. The . . . rule [of *Clemens v Bruce*, 122 Mich App 35; 329 NW2d 522 (1982)] would require disqualification where the Court becomes enmeshed in other matters involving "peti-

---

[13] The concurrence misses the point in this regard. The fact that Judge Giddings conducted the trial as though the Governor were a party *by itself* prejudiced the department. The issue is, therefore, not a "distract[ion]" for this Court, but instead is inextricably connected to the issue we must decide. The issue whether the Governor is a party did, however, severely distract and obfuscate the central issue of the underlying claim at the trial level.

tioner" (the Department of Corrections), not *some third party such as the Governor.*

This unexplained switch at the eleventh hour does not, however, eviscerate Judge Giddings' previous statements, evidencing his belief that the department and the Governor were the same entity.[14] Therefore, I believe that the fact that Judge Giddings perceived the Governor to be a party and conducted the trial accordingly biased the department's ability to defend sufficiently to permit analysis of the case pursuant to the situations enunciated in *Crampton, supra.*

### 1. JUDGE ENMESHED IN OTHER MATTERS

Under situation three in *Crampton,* Judge Giddings was obligated to disqualify himself if he became " 'enmeshed in [other] matters involving petitioner . . . .' " *Crampton, supra* at 351, quoting *Johnson v Mississippi,* 403 US 212, 215; 91 S Ct 1778; 29 L Ed 2d 423 (1971). In *Johnson,* the United States Supreme Court concluded that a trial judge should have recused himself because he lost a civil rights action brought by the same petitioner[15] facing contempt in a subsequent action. The Court concluded that "[t]rial before 'an unbiased judge' is essential to due process." *Id.* at 216, citing *Bloom v Illinois,* 391 US 194, 205; 88 S Ct 1477; 20 L Ed 2d 522 (1968), and

---

[14] The majority recognizes that the plaintiffs and plaintiffs-intervenors, similar to Judge Giddings, argued inconsistently on this issue. *Ante* at 510. Judge Giddings, plaintiffs, and plaintiffs-intervenors argue both ways. For purposes of obtaining control over Governor Engler, they assert that he was a party to the action. In contrast, for purposes of disqualification, they argue that the Governor is not a party. The majority fails to see, however, how this prejudiced the department in its formulation of a defense.

[15] The petitioner was a defendant in a criminal proceeding in the circuit court of Grenada County, Mississippi.

*Mayberry v Pennsylvania*, 400 US 455, 465; 91 S Ct 499; 27 L Ed 2d 532 (1971).

In isolation, Judge Giddings' conduct appears somewhat innocuous. However, each incident must not be considered in a vacuum; rather, they should be considered in relation to the judge's overzealous pursuit of the Governor. I agree with defense counsel that Judge Giddings' actions over an eleven-month period demonstrate that he became "enmeshed" in matters far beyond the scope of the *Cain* litigation and resulted in a violation of the department's due process right to an impartial decisionmaker. This conclusion is first supported by the fact that Judge Giddings recommended *substantive changes* to plaintiffs' motion to show cause why Mr. Truscott and Governor Engler should not be held in criminal contempt.[16]

Initially, Judge Giddings recommended that plaintiffs separate their motion into individual counts. Next, he suggested that plaintiffs should not proceed against John Truscott, suggesting that the motion to show cause be brought only against Governor Engler. Finally, and most egregiously, he advised plaintiffs to "consider including reference to inaccuracies in Governor Engler's letter of August 12[, 1994,]" to the Attorney General. In doing so, the judge unmistakably

---

[16] The majority concludes that Judge Giddings' advice to plaintiffs was appropriate because plaintiffs appeared in propria persona. See *ante* at 517. It should be noted that the interest of plaintiffs in this litigation is identical to that of plaintiffs-intervenors *who did have counsel present.* The majority's analysis enables a litigant to proceed in propria persona and receive with impunity extensive assistance of a trial judge. It is certainly more advantageous to have the assistance of the trial judge than the assistance of counsel.

recommended another ground on which plaintiffs could proceed against the Governor.[17]

Judge Giddings unified the interest of the Governor and the department for purposes of this litigation and proceeded to assist plaintiffs in drafting a motion to hold the Governor in contempt.[18] This illustrates how the judge clearly became "enmeshed" in matters involving the Governor. He, in fact, became so enmeshed that he assisted a party before the court.

Several actions of Judge Giddings before his assistance of plaintiffs further demonstrate that he became "enmeshed" in other matters involving Governor Engler and the department. The judge first filed a letter of complaint against the Governor with the Attorney Grievance Commission on October 21, 1993. Next, in November 1993, Judge Giddings appointed a spokesperson for the male prisoners. His purported basis for the appointment was that "we have only gotten one side on most instances because of the practical problems." *Id.* However, after indicating that the Governor had released an untrue statement to the press, he candidly stated:

---

[17] The majority is similarly concerned about the propriety of Judge Giddings "suggestion." *Ante* at 517-518. The majority is somehow able to justify Judge Giddings' assistance because defense counsel did not object either at the in-chambers discussion or at the following hearing. However, Judge Giddings' assistance is either proper or improper. The failure of defense counsel to object when he was under no obligation to do so certainly cannot diminish the severity of the judge's actions. It should be noted that, under the court rule, defense counsel was only obligated to raise a timely motion for the judge's disqualification within fourteen days of the improper act. *Crampton* has no such requirement. Defense counsel brought a timely motion and was under no additional obligation to object.

[18] Plaintiffs, in fact, followed the judge's advice and restructured their pleading into four separate counts, including count II, which incorporated Governor Engler's August 12, 1994, letter. Moreover, the subsequent motion named Governor John Engler only.

> This is a release . . . that went to every newspaper. The more recent one went, as far as I can determine, to every major newspaper in the State. . . . *I have to be able to respond to all of those.* I shouldn't have to respond to any of them. That's not my job. I'm not a litigant. It's not my job. I would like to say to the newspaper person, hey, get your fanny down here. The court file is there. Read the Court file. [Emphasis added.]

This makes it clear that the spokesperson was not only appointed to be the voice of the prisoner litigants, but also to be the voice of Judge Giddings. This was an explicit and improper manipulation of the litigation to respond to the criticism of Governor Engler.

Additionally, Judge Giddings entered media contact orders on June 2 and 30, 1994. In his order dated June 2, 1994, the judge, sua sponte, ordered that any written remarks or press releases made by employees or agents of the state regarding the *Cain* litigation must be faxed to plaintiffs' spokesperson, to a member of plaintiffs' class, and to plaintiffs' counsel at the same time the remarks are made to the public. The order required the same of plaintiffs in regard to any press releases made by them. This was another attempt to obtain jurisdiction and control over the Governor (a person he perceived to be a party) and to address matters clearly outside the scope of the litigation.

Each of these actions by Judge Giddings had one improper goal: to obtain control of the Governor in such a manner as to control the Governor's public opinion of the *Cain* litigation.[19] The judge's efforts unnecessarily consumed *considerable* time and judi-

---

[19] Mr. Govorchin argued:

cial resources. Irrespective of whether the Governor's comments may be viewed as improper, the judge was sworn to proceed and remain focused on the merits of the case before him—which he had increasingly become unable to do. Instead, he expended judicial resources to assert jurisdiction over the Governor to the obvious prejudice of the department.

Defendant's reliance on *Clemens, supra,* a subsequent decision applying *Crampton,* is persuasive. *Clemens* affirms that the present set of facts warrant disqualification of Judge Giddings. In *Clemens,* the Court of Appeals followed *Crampton* and held that the risk of actual prejudice on the part of the judge required disqualification without a showing of actual prejudice. The record in *Clemens* reflected a serious dispute between the plaintiffs' attorney and the trial judge regarding appointment of counsel for indigent criminal defendants. The plaintiffs' attorney filed a complaint against the judge with the Judicial Tenure Commission. The complaint remained pending at the time of trial. The court held that these facts warranted disqualification of the trial judge because, under *Crampton,* the judge had been the target of personal abuse or criticism from a party before him, and the judge had become enmeshed in other matters involving the petitioner. Similar to the present case,

---

What has happened here that's different is this gradual refocusing of the attention in favor of the outside, this outside connection, this focus on the contents of the media remarks of somebody not in the case. I think that's what happened is different. That's what's given this color to this perception to this under *Clemens* demonstration of this personal enmeshing, becoming enmeshed with these outside matters, with other matters involving a person that the Court had viewed as connected with this case. That's what gives the demonstration of bias.

the facts of *Clemens* "suggested such a risk of actual prejudice on the part of the judge that due process required his disqualification . . . ." *Id.* at 38.[20]

### 2. JUDGE TARGET OF CRITICISM

*Crampton* states that the risk of an impartial decisionmaker is too great where the judge " 'has been the target of personal abuse or criticism from the party before him,' " *id.* at 351, quoting *Withrow, supra* at 47. The Court relied on *Mayberry, supra* at 465, in which the United States Supreme Court held that a judge who is "vilified . . . necessarily becomes embroiled in a running, bitter controversy," rendering the judge unlikely to "maintain that calm detachment necessary for fair adjudication." *Id.* at 465. Quoting *Cooke v United States*, 267 US 517, 539; 45 S Ct 390; 69 L Ed 767 (1925), the Court stated that " '[t]he judge must banish the slightest personal impulse to reprisal, but he should not bend backward and injure the authority of the court by too great leniency. The substitution of another judge would avoid either tendency . . . .' " *Mayberry, supra* at 464. Additionally,

> "the judge should not himself give vent to personal spleen or respond to a personal grievance. These are subtle matters, for they concern ingredients of what constitutes justice. Therefore, justice must satisfy the appearance of justice." [*Id.* at 465, quoting *Offutt v United States*, 348 US 11, 14; 75 S Ct 11; 99 L Ed 11 (1954).]

---

[20] Although *Clemens* characterized the situations in *Crampton* as factors, I agree with the majority that they are better termed examples of those situations in which a judge must be disqualified absent a showing of actual bias.

I hasten to add, however, that a "judge cannot be driven out of a case." *Mayberry, supra* at 463. Accordingly, I do not premise my conclusion that Judge Giddings should be disqualified on the basis of the criticism leveled by the Governor, but rather on the inappropriate means by which Judge Giddings retaliated.

The public comments Governor Engler made in regard to the *Cain* litigation and specifically in regard to Judge Giddings quite evidently struck at " 'the most vulnerable and human qualities' " of the judge's temperament. *Mayberry, supra* at 466, quoting *Bloom, supra* at 202. Such criticism does not *itself* violate a litigant's due process rights sufficient to disqualify the judge. However, Judge Giddings' repeated attempts to respond to the Governor's comments through plaintiffs did violate defendant's due process rights. While the comments made by the Governor arguably may have been inappropriate, Judge Giddings was sworn to impartially focus on the issues before the court and bring the litigation to a reasonably swift and completely fair resolution. The facts indicate that Judge Giddings was unable to surmount the public criticism and discharge his obligation by divorcing himself from the acrimonious political climate that had arisen. Accordingly, on these facts, I agree that "it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place." *Mayberry, supra* at 464.

B

Defendant also brought its motion for disqualification pursuant to two subsections of the court rule.[21] The subsection pursued on appeal, MCR 2.003(B)(2), provides that a judge is disqualified if "personally biased or prejudiced for or against a party or attorney . . . ." The Court of Appeals has repeatedly construed this phrase to require a showing of actual bias.[22]

---

[21] MCR 2.003(B)(2) and (7). Subsection 7 was eliminated, effective September 1, 1995. See n 3.

[22] *In re Forfeiture of $1,159,420*, 194 Mich App 134, 151; 486 NW2d 326 (1992); *People v Lobsinger*, 64 Mich App 284, 285; 235 NW2d 761 (1975); *People v Page*, 83 Mich App 412, 419; 268 NW2d 666 (1978); *MacDonald v Ford Motor Co*, 117 Mich App 538, 542; 324 NW2d 489 (1982); *Tyrrell v Tyrrell*, 107 Mich App 435, 437-438; 309 NW2d 632 (1981).

The court rule is based upon GCR 1963, 912, which was based upon GCR 1963, 405.1:

Grounds for Disqualification. The issue of disqualification of a judge to hear an action may be raised by motion of any party or by the judge upon his own motion. . . . The judge shall be deemed disqualified to hear the action when the judge:

\*     \*     \*

(3) is personally biased or prejudiced for or against any party or attorney;

\*     \*     \*

(8) for any other reason is excluded or disqualified from sitting as a judge at trial.

Accordingly, GCR 1963, 405.1(3) and (8) correspond to MCR 2.003(B)(2) and (7).

Contrary to the majority's position, the "actual bias" language is not derived from the court rule itself. *Ante* at 495. Rather, it appears to have originated in *Wayne Co Prosecutor v Doerfler*, 14 Mich App 428, 441; 165 NW2d 648 (1968). The Court stated that the "language of GCR 1963, 405.1(8) apparently a catch-all phrase, still requires some actual showing of prejudice and it will not encompass the unfounded fears of defendants." *Id.*

This Court, therefore, must decide whether defendant has sufficiently shown that the judge was actually biased. I disagree with the majority because I believe that the lower court abused its discretion in concluding that Judge Giddings was not actually biased under the court rule. The judge assumed a role that exceeded the scope of his role of neutral and impartial decisionmaker. Assisting a party in drafting a motion prejudices the judge's impartiality and is an instance of personal bias under MCR 2.003(B)(2). Because the judge unified the interest of the Governor and the department, the department was analogously prejudiced by the judge's assistance.

A judge must not relinquish his role as an impartial decisionmaker by providing inordinate assistance to the parties before the court. In *Tretick v Layman*, 95 Md App 62, 69; 619 A2d 201 (1993), the Court of Special Appeals of Maryland aptly stated:

> The court, in our adversarial system, cannot substantially help either party; to lend aid would subvert a necessary part of our adversarial system designed to guarantee just trials, which require the impartiality of the referee—the trial judge.

---

Subsequent Court of Appeals decisions have fairly consistently upheld this requirement although *In re Disqualification of 50th District Court Judge (On Remand)*, 193 Mich App 209, 214; 483 NW2d 676 (1992), the Court of Appeals disqualified a judge because of the "appearance of impropriety arising from the financial ties between [the judge] and [the defendants' attorney's] law firm . . . ." The Court held that the appearance of impropriety may be sufficient to disqualify a judge after evaluation of the totality of the circumstances. See also *Ireland v Smith*, 214 Mich App 235, 251; 542 NW2d 344 (1995), in which the Court of Appeals held: "we conclude that the nature and scope of the media exposure create an appearance of bias in this case." The majority of cases, however, holds that the court rule requires a showing of actual bias, which is more loyal to the language of the court rule.

Therefore, the assistance to plaintiffs in their motion to show cause as more fully described in part II(A) by itself rises to the level of actual bias under MCR 2.003(B)(2) and warrants the judge's disqualification.[23]

Chief Judge Houk reached the opposite conclusion because he misunderstood the definition of actual bias. Close scrutiny of the hearing transcript and the opinion of the chief judge indicate that he erroneously concluded that actual bias may only be demonstrated by *a prejudicial ruling* of the court:

> *The Court*: Let's focus back then on how this somewhat tenuous relationship has actually prejudiced your client, the Michigan Department of Corrections. *Demonstrate a ruling where it has done that.*
> *Mr. Govorchin*: Demonstrate a what?
> *The Court*: *A ruling.* [Emphasis added.]

Chief Judge Houk later insisted: "[Y]ou can't point me to a *single ruling* in this case where *the Judge has ruled against your client.*"[24] Moreover, Chief Judge Houk's inaccurate determination that actual bias may only be demonstrated by proof of an unfavorable ruling is corroborated in his opinion denying the motion for disqualification: "Both before this Court and in front of Judge Giddings counsel for Defendants were unable to point to a *single ruling* or event that

---

[23] Plaintiffs, in fact, followed the judge's advice and restructured their pleading into four separate counts, including count II, which incorporated Governor Engler's August 12, 1994, letter. Moreover, the subsequent motion named Governor John Engler only.

[24] Additionally, Chief Judge Houk inquired "[h]ow has that prejudiced your client, not the Governor? *How is that reflected in the Judge's rulings*? How can you demonstrate actual bias or prejudice?" (Emphasis added.)

prejudiced the Defendant Michigan Department of Corrections."[25] (Emphasis added.)

In his opinion, Chief Judge Houk stated that "[d]efendant has failed to discharge its 'heavy burden' and demonstrate 'actual prejudice' . . . ." He arrived at this conclusion, however, by mistakenly stating that defendant's counsel acknowledged at the hearing that he was unable to show any actual bias against the department. This is a mischaracterization of defense counsel's statements. Defense counsel only conceded that there had not been a *biased ruling* by Judge Giddings.

Although a ruling is one means by which a judge may evidence actual bias, it is certainly not the only means by which a moving party may demonstrate that a judge is actually biased.[26] Certainly, a presiding judge's substantial assistance to a party before the court is sufficient evidence of actual bias. Accordingly, I would hold that Judge Giddings displayed actual bias under MCR 2.003.[27]

---

[25] Although the judge mentions the ambiguous term "event," it is clear from the several unambiguous statements made during the hearing that he equated actual bias with a *ruling* of the court.

[26] Mr. Govorchin argued at the hearing before Chief Judge Houk that actual bias and prejudice as identified in MCR 2.003 "can be demonstrated a number of ways; any of those ways enumerated which are examples of actual bias and prejudice in the courtroom, or under the *Clemens versus Bruce* case by a showing of any one of four other factors."

[27] Similarly, Judge Giddings erroneously insisted that defense counsel present evidence of bias through a court ruling: "Can you point to one, point to one instance, one single ruling with regard to any suggestion, any aspect of this case, not a media thing, that would reflect some prejudgment or bias on this Court's part?" The majority mistakenly identifies this as defense counsel's concession that Judge Giddings had not shown actual bias or prejudice. *Ante* at 504. Mr. Govorchin only agreed that there was no actual bias or prejudice "[u]nder the Court's rulings." (Emphasis added.) This fact undermines the majority's conclusion that there was, in fact, no actual bias. *Id.*, n 40.

C

Finally, the majority acknowledges, but does not address, the significance of the fact that Judge Giddings is the trier of fact in this proceeding. This case has primarily been a court of claims action, and, therefore, the judge rather than a jury will preside as finder of fact. The potential for subtle bias and prejudice is therefore heightened. It is much more difficult, if not impossible, to guard against biased findings of fact.

This Court in *People v Ramsey*, 385 Mich 221; 187 NW2d 887 (1971), recognized, admittedly under different circumstances, that the Court must proceed cautiously when the trial judge is sitting as trier of fact. The Court held it was error requiring reversal for a judge acting as trier of fact to review and subsequently refer to a transcript not in evidence. The Court held:

> This case demonstrates the need for an absolute rule in this situation. There is no way to determine whether or not the trial court was prejudiced by "glancing" at the transcript. In fact, it is difficult to determine precisely how much, if any, of the transcript was read by the court, or for what purpose. Therefore, in order to avoid problems of proof on this issue, we hold that as an absolute rule it is reversible error for the trial court sitting without a jury to refer to the transcript of testimony taken at the preliminary examination except under the exceptions provided by statute. [*Id.* at 225.]

Ramsey illustrates the precautionary measures that are necessary to guard against judicial bias or prejudice in cases in which the judge sits as the trier of fact. The Supreme Court of Arkansas has noted this danger in the context of judicial disqualification.

In *Burrows v Forrest City*, 260 Ark 712, 720; 543 SW2d 488 (1976), the court stated: "[T]he better procedure, where the trial judge sits as a fact finder, would be to resolve the difference in favor of the appearance of fairness and remand this case for hearing . . . before a different judge."

### III

Judge Giddings should be disqualified because he became " 'enmeshed in [other] matters involving petitioner' " and became " 'the target of personal abuse or criticism from the party before him.' " *Crampton, supra*. Judge Giddings' persistent pursuit of Governor Engler prejudiced the department by denying it the right to a fair and reasonably timely adjudication of its rights on the underlying claim. Therefore, in order to preserve defendant's due process right to "an unbiased and impartial decisionmaker," under *Crampton*, Judge Giddings should be disqualified.

Additionally, Judge Giddings has demonstrated a personal bias against the department pursuant to MCR 2.003(B)(2). A party moving to disqualify a trial judge pursuant to MCR 2.003(B)(2) is not required to prove actual bias by proof of a court ruling. The substantial assistance given to plaintiffs in this case by Judge Giddings sufficiently demonstrated that he was actually biased.

Accordingly, I would affirm the decision of the Court of Appeals.

WEAVER, J., took no part in the decision of this case.