# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* LEONARD, Minors.

UNPUBLISHED
August 30, 2018

No. 340557
Washtenaw Circuit Court
Family Division
LC No. 15-000140-NA

Before: SHAPIRO, P.J., and M. J. KELLY and O'BRIEN, JJ.

PER CURIAM.

Respondent appeals the trial court's order terminating his parental rights to the minor children, AL and LL, under MCL 712A.19b(3)(j) (reasonable likelihood of harm). Because the trial court failed to weigh all the evidence when reviewing the children's best interests, we vacate the trial court's order of termination and remand for further proceedings.

## I. BACKGROUND AND CRIMINAL CHARGES

The facts giving rise to the court taking jurisdiction over these children occurred on September 30, 2015. On that date, the FBI executed a search warrant at the residence respondent shared with his then-wife, Megan Wolgast, and their children, who at that time were just under two years and four years old, respectively. During the search, the FBI seized and accessed respondent's computer and accessories. The search revealed that respondent had downloaded approximately 140 files of child pornography. The files included approximately 5,000 images, many of which were highly disturbing with some containing images of penetration of pre-school aged children. Files containing adult pornography were also found. When interviewed by the FBI, respondent admitted to accessing and downloading child pornography starting in 2012. Respondent was charged in federal court with one count of accessing child pornography, and one count of possessing same. 18 USC § 2252A(a)(5)(B).

While on bond, respondent resided with his parents. Wolgast remained in the family home with the children. Respondent was granted court-ordered visitation with his children under conditions set forth by the federal pretrial services, one of which was that visitation had to be supervised by a person with knowledge of the allegations against respondent.

1

On July 26, 2017, respondent pleaded guilty to one count of possession of child pornography. The federal court's sentencing guidelines provided for a sentence of 97 to 121 months. However, the sentencing court departed from the guidelines and sentenced respondent to a term of 36 months in prison.[1] Upon release from prison, respondent was required to register as a sex offender. At sentencing, the trial court stated, "The fact that you have been receiving treatment and appear to be treatable plays an important role . . . ." The court also noted that respondent's "history does not suggest any likelihood of physical contact with a child."

## II. CHILD PROTECTION PROCEEDINGS

On December 14, 2015, approximately three months after his arrest, petitioner initiated proceedings seeking termination of respondent's parental rights. While the petition was pending, respondent and Wolgast divorced. Wolgast, without opposition from respondent, was given sole legal and physical custody of the minor children. Respondent also agreed to allow Wolgast to change the minor children's last names in order to protect them. He also agreed that Wolgast should be awarded the entire proceeds from the sale of their marital home, and 100% of her 401k assets.

Respondent had no prior arrests or convictions, and he had never been the subject of an investigation or other action by any child protection agency. Significantly, it has never been alleged that respondent engaged in any improper physical or sexual contact with any children at any time. It is also undisputed that his children were not depicted in any of the photographs and that respondent did not take any of the photographs or know any children depicted in them.

Respondent admitted that a statutory basis for termination existed under MCL 712A.19b(3)(j), which provides grounds for termination when "there is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." Respondent admitted that he downloaded images of child pornography on his computer, that he pled guilty to possession of child pornography in the federal court, and that "roughly 5,000 images of child pornography" was found on his computer.

The court conducted a best-interests hearing on September 1, 2017. At the hearing, Wolgast testified that she confronted respondent about the allegations after his release on bail, and he admitted that he had been viewing child pornography for at least three years. She testified that respondent told her that this conduct likely started after the trauma caused by the death of their older child who was 14 months old when she died in 2012. That child was born with a rare, non-familial, genetic syndrome requiring 24-hour care. Wolgast testified that although respondent worked 40 to 60 hours a week, he took care of the child's feeding and breathing tubes, read to her, held her, and tried to introduce her to the world by taking her on

---

[1] The court noted that because the government was seeking a sentence of at least 60 months in prison and respondent requested a sentence of no more than 36 months, "both parties acknowledge[d] that a downward variance from the guideline range was warranted in this case." The court noted that a sentence of 36 months "would serve the ends of justice in this case and be sufficient, but not greater than necessary, to satisfy the purposes of the sentencing laws."

trips and bicycle rides, along with her medical instruments. Her body was discovered by respondent. Wolgast testified that after this child's death, respondent refused to see a therapist and was like a "brick wall."

Although Wolgast testified that AL and LL were happy and excited during respondent's supervised visits, she expressed concern that over time, the person supervising the visits would relax and that she feared this could put the children at risk. She testified that she had no doubts that respondent loves his children and that they were attached to him;[2] however, she stated that she did not feel that she could trust respondent after the incident. She also testified that she had concerns that having respondent return to the children's lives after his incarceration would affect their stability and would be difficult for them.

Respondent testified about the devastating effect the death of their first child had on him. He testified that he could not recall exactly when he began to view child pornography, but he could not recall any such conduct prior to the child's death. He testified that he took steps to protect his family from his addiction, and continued to care for his children during the period. He also stated that when the FBI raided his home, he cooperated with them by admitting his wrongdoing, offering to take any test, and answering any questions they had. He stated that after his arrest, he began counseling and therapy, which helped him to understand the effects of his actions. He was diagnosed with an addiction to pornography, but believed that he could overcome that addiction. He testified that he understood the consequences of his actions and the need to stop his addiction in order to help himself and his family.

Psychologist Steven Miller was called as a witness by respondent. Dr. Miller was qualified as an expert in psychosexual risk assessment and sex offender treatment. According to Miller, a psychosexual risk assessment is "an attempt to blend a classic standard psychological evaluation and diagnosis with risks of recidivism and dangerousness for individuals who have committed sex crimes." Dr. Miller testified that he interviewed respondent on three occasions—December 8, 2016, April 27, 2017, and May 3, 2017. He stated that at the time respondent was suffering from "an adjustment disorder with both depression and anxiety," and had "some passive-aggressive character traits" that did not amount to "a full-scale psychological character disorder or personality disorder." Miller believed that respondent was stable, could overcome his adjustment disorder, and was doing better each time he saw him.

---

[2] Also admitted was an 8/1/16 report from respondent's therapist. He indicated that his specialty is in the assessment and treatment of sexual abuse and deviancy and that he has treated respondent since June 2016. He observed the respondent with his children, described the interactions, and concluded that

> [respondent] and his children . . . have an intimate emotional bond together.[Respondent] has demonstrated his love and concern for his children during each therapy session this writer has had with him for over one year. It is this writer's clinical opinion, from working with [respondent] for over one year, and observing him with his children, that it would be in the children's best interest to maintain a relationship and emotional bond with their father.

More to the point, Miller opined that respondent was not sexually interested in children under 13 or "in themes of domination, control[,] and sexual violence" and that this conclusion was consistent with findings on testing. Miller conducted what he described as the Abel Assessment for Sexual Interest-3 test. The test utilizes, among other things, objective measures of visual reaction time to certain stimuli. The test assesses, among other thing, "whether [respondent] appears to have a persistent sexual interest in children." Miller noted that objective measures taken "beyond [respondent's] awareness show that his significant sexual interests are: Adult females, Adolescent females, and Adult males." According to Miller, the test revealed that respondent "does not appear, in the objective results, to have an interest in children (age 13 years and younger)."

Miller concluded that respondent exhibits "characteristics of some compulsive features . . . of a sexual addiction," but that respondent was taking steps to address his addiction with therapy. He testified that recovery of the addiction was a life-long process, and he believed that respondent was capable and willing to continue with the process throughout his life. Miller further testified that respondent was capable of being a fit parent and that he showed no signs of "predatory offending," which he described generally as actions designed to seek out minors for direct contact.[3] Miller stated that in his opinion, respondent would comply with the norms of the society, the requirements of the court, and the instruction of his therapist. As to the ultimate issue before the court, Miller opined that it was in the best interests of the children to preserve respondent's parental rights.

Jennifer M. Zolkowski, MS, LLP, also conducted a psychological evaluation and sex offender risk assessment. According to her report, respondent told Zolkowski that

> his use of pornography was initially fairly main stream. As he continued to look at the materials, his viewing became increasingly deviant. He states that he stumbled upon child images accidentally, but once he began viewing the material he sought out more images. He states that he knew what he was doing was wrong and he wanted to stop, but he was afraid to seek help because he thought he would be turned over to the authorities. . . . He states that he turned to pornography at times when he felt frustrated, as he found it to be a stress reliever.

---

[3] According to Miller,

> Predatory sexual offender on the internet, online offender, often change their [sic] name to look more like a teenager or somebody. Also they're targeting an age group that they're targeting or have pseudonyms or—or something else to take you off the track. They spend much more time in the chat room then [sic] average. They spend a great deal of time online, none of which were the behaviors that were described to me by [respondent]. [Respondent] did not participate in chat behavior. He did not partici—another one would be on camera, naked viewing, and naked showing, exhibition on camera, that sort of thing. None of that was part of his sexual addiction. So those—those are things which would tend to support a more predatory approach.

4

Zolkowski also interviewed the children's mother, and reported her belief that he had discontinued looking at pornography, that he loved the children, and felt genuine remorse for his actions. Zolkowski also discussed studies concerning recidivism in internet-facilitated child pornography offenders, stating:

> According to the Association for the Treatment of Sexual Abusers, there is currently no risk assessment tool specifically developed for use with Internet-facilitated offenders who have no official history of contact sexual offenses. Several studies of child pornography suggest these individuals present less risk for future hands-on offenses, than contact sex offenders. Child pornography offenders also presented a relatively low risk to commit another child pornography offense. (Internet Facilitated Sexual Offending, 2010, http://www.atsa.com/internet-facilitated-sexual-offending.)

> A 2011 study reviewed recidivism rates from 9 samples of Internet offenders (a total sample size of 2,630) followed for an average of three years. Approximately 4.6% of Internet offenders committed a new sexual offense of some kind during this time period, with 2 percent committing a contact sexual offense and 3.4% committing a new child pornography offense; some offenders committed both types of crimes. This means that 95.4 percent of individuals who committed an internet related sex offense did not commit another sexually related offense. (Contact sexual offending by men with online sexual offenses. Seto, Hanson, and Babchishin (2011)).

At the conclusion of the hearing, the trial court issued its opinion from the bench and reviewed the best-interest factors individually. The first factor reviewed by the trial court was the nature of the child's bond to the parent. The court stated that "[t]he question of a bond from a child's standpoint is not that a bond exists, but . . . is it a healthy bond from a child's standpoint." The court noted that the testimony shows that there is no clear understanding of why the viewing of child pornography exists, that the behavior cannot be "cured," and that the children subjected to penetration in some of the images were the same age as respondent's children. The court also opined that anyone who views child pornography "feeds a system of human trafficking that is absolutely frightening" and that "[e]very single child depicted in those 5,000 images has been severely traumatized and brutalized by the taking of that photograph." The court further stated that by viewing child pornography, respondent helped contribute to "an empire that will continue to view these children as property to be used in ways that will damage them the rest of their lives." The court concluded that "respondent father [does not] truly understand how insidious that is." Based upon these observations, the court concluded, "I do not believe that the evidence establishes that this is a healthy bond . . . I think the evidence establishes, by a preponderance of the evidence that whatever bond exists from the standpoint of a child, is not a healthy bond . . . [and] it weighs in favor of termination."

As to the second factor, i.e. the parent's parenting ability, the court stated, "The fact that an individual could look at these images, and want to continue to look at these images, and at the same time profess a deep appreciation and responsibility for a child, I do not believe convincing at all and I think by a preponderance of the evidence, [it has been] established that the parent's parenting ability is not sufficient in this case for these children."

5

The court then stated that the third factor, i.e., the need for permanency, stability, and finality is "really critical." The court noted that it had also presided over the divorce proceedings where the children's mother had been given full legal and physical custody, but noted the mother's concern about what would happen to the children in the event she died. The court concluded:

> How long do we have to deal with the uncertainty of this insidious disease, and its effect on these children[?] And I do think that given that will never be cured, unknown what the root is, whether the root ever will be there, that the very deep, dark, insidious nature of it that is so destructive of human beings, that the children's need for permanency, stability, and finality indicate that this [respondent] should not be part of their lives.

The last factor considered by the trial court was domestic violence. The court stated that respondent's conduct was "a form of domestic violence. I do think downloading child pornography at this level in the family home . . . that situation is as violent as you can get." The court considered the fact that respondent stated that he had never improperly touched a child and stated that "the fact that you would even think about it, consider it, find it, anything at all of value, is violence. It is a form of violence." After reviewing the factors, the court concluded that termination of respondent's parental rights was in the children's best interests.

## III. ANALYSIS

### A. BEST-INTERESTS FACTORS

In deciding whether termination of parental rights is in the best interests of the child, the court considers a variety of factors which may include "the child's bond to the parent, the parent's parenting abilities, the child's need for permanency, stability, and finality, and the advantages of foster home over the parent's home." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child's well-being while in care, and the possibility of adoption." *Id.* at 714. "With respect to the trial court's best-interest determination, we place our focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). A trial court must terminate a parent's parental rights if it finds that a statutory ground under MCL 712A.19b(3) has been established by clear and convincing evidence and that termination is in the child's best interests. *In re White*, 303 Mich App at 713. "This Court reviews for clear error the trial court's ruling . . . that termination is in the children's best interest." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011); see also MCR 3.977(K). A decision of the trial court is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re JK*, 468 Mich 202, 209-210; 661 NW2d 216 (2003).

Here, the trial court found that each of the best-interest factors weighed in favor of termination basing its findings as to each factor solely on respondent's history of viewing photos depicting child pornography. The CPS investigator testified that respondent's children were not afraid of him and cited no grounds, other than the pornography, for her recommendation to

6

terminate respondent's parental rights. She agreed that respondent had never engaged in any abuse or neglect of the children, but made her recommendation because she was concerned that respondent's behavior could move from mere observation of pornographic materials to contact offenses. However, there was no evidentiary basis for her conclusion as petitioner did not present any evidence of the likelihood that child pornography viewers escalate to contact offenses.

We cannot agree with the trial court's conclusion that respondent's unlawful viewing of child pornography necessarily meant that he did not have, and more importantly, could never have, a "healthy bond" with the children. There was no evidence that the bond between respondent and his children was harmful to them emotionally and there was neither evidence, nor allegation, that he had ever harmed the children physically. To the contrary, the evidence was that respondent had been a good father, the children loved him, and that visitation, albeit supervised, went well. The trial court never considered the evidence of the actual bond between respondent and his children; instead it concluded that respondent's child pornography activities, which by all reports had ceased in 2015, rendered that bond "unhealthy" regardless of any evidence to the contrary.

Neither the briefs nor our research have revealed any cases in which the viewing of child pornographic materials alone rendered irrelevant all the evidence of the relationship between respondent and the children, and by definition, made it impossible for a respondent ever have a healthy bond with his children.

The same is true for the court's findings regarding parenting ability and domestic violence. The court took no note of any testimony regarding parenting ability, most of which was favorable to respondent, including the level of care he had provided to the couple's deceased child that had been born with a congenital and fatal disease. Instead the court found that respondent was incapable of having good parenting skills because he had engaged in viewing child pornography. The court also erred by finding that viewing child pornography was a form of "domestic violence." Respondent's acts of viewing pornographic images of young children can properly be characterized as repulsive and detestable, but it is neither violent nor, in this case, domestic. The trial court noted the devastating effect of child pornography and human trafficking on its victims, and concluded that respondent did not fully understand the damage it causes to its victims. However, this is not domestic violence. It was not directed at anyone in respondent's family or home, and he did not threaten or physically harm anyone.

Regarding the children's needs for permanency and stability, the trial court expressed concern about respondent's incarceration, his addiction, and the likelihood that he could resume this conduct or that it could escalate to physical abuse of his own or other children. We agree that respondent's incarceration and the extensive, permanent restrictions on his time with the children weigh against the likelihood that the respondent will be able to provide permanence and stability to them. However, it is also relevant that the children had never stopped living with their mother and were stable and thriving under her care despite these and the criminal proceedings. Respondent was sentenced to 36 months in prison, but he could qualify for release from prison in one year and then be assigned to a halfway house for 6 to 12 months. Therefore, he could return to the community in 18 to 24 months. After his release, respondent will be supervised by the federal system for five years, which will entail taking lie detector tests,

7

software monitoring, reporting, and random searches. The CPS investigator testified that she was concerned that respondent's incarceration for two to three years would create a gap in the children's lives, and that upon his return with tons of restrictions, the adjustment would be hard on the children. The children's mother also testified to her concern that respondent returning to the children's lives after his incarceration would affect their stability. These concerns are proper, but they must also be weighed against what harm termination of what had been a close child-parent bond may cause.

The trial court's finding that respondent's addiction to pornography could never be cured is also questionable. Although Miller testified that recovery of pornography addiction was a life-long process, he testified that he believed that respondent was capable and willing to continue with the process throughout his life. There is no doubt that respondent expressed remorse for his actions and started therapy to address his addiction. There was also testimony that he was doing well in therapy and addressing his addiction.[4]

For these reasons, we vacate the order terminating respondent's parental rights, and remand the case to the trial court for it to redetermine the best-interests factors based on the totality of the circumstances. While the matter is pending on remand, the trial court may order the implementation of a case service plan and respondent's adherence and response to that plan may be considered by the court.

## B. JUDICIAL BIAS

Respondent also argues that the trial court displayed bias or prejudice against him making fair judgment impossible. We disagree.[5]

A trial court must act as a neutral and detached judicial officer. See *Cain v Michigan Dep't of Corrections*, 451 Mich 470, 509; 548 NW2d 210 (1996). "[I]t is well established that opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings . . . do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *In re Conservatorship of Brody*, 321 Mich App 332, 350; 909 NW2d 849 (2017) (quotation marks and citations omitted). "A trial judge is presumed to be impartial and the party who asserts partiality has a heavy burden of overcoming that presumption." *In re MKK*, 286 Mich App 546, 566; 781 NW2d 132 (2009).

---

[4] Petitioner points out that both psychological reports were prepared by experts retained by respondent and that petitioner had been unable to obtain a psychological evaluation because there were criminal charges pending against respondent. As those charges are not resolved, we leave it to the trial court's discretion whether on remand, petitioner should be permitted to obtain such an evaluation.

[5] Whether judicial misconduct denied a party a fair trial presents a constitutional question which this Court reviews de novo. *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

When reviewing a judicial bias claim, the reviewing court should consider "the totality of circumstances, to determine whether the judge demonstrated the appearance of advocacy or partiality on the whole." *Stevens*, 498 Mich at 172.

> In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trail issues therein, the extent to which the judges conduct was directed at one side more than the other, and the presence of any curative instructions. This list of factors is not intended to be exhaustive. Reviewing courts may consider additional factors if they are relevant to the determination of partiality in a particular case. . . . The reviewing court must consider the relevance and weigh the significance of each factor under the totality of the circumstances of the case. [*Stevens*, 498 Mich at 172 (citations omitted).]

Respondent has failed to show that the trial judge was biased or prejudiced against him. Respondent alleges that the trial court continuously expressed revulsion towards his addiction and that the judge's entire findings were overshadowed by his inability to see any redeeming quality in a person that developed an addition to child pornography. We agree, as discussed above, that the trial court failed to consider all the evidence, and erred by concluding that respondent's actions, in and of themselves, rendered his relationship with his children forever unhealthy. However, we find no reason to conclude that on remand, the trial court will rule based on prejudice or fail to consider the totality of the evidence, as discussed herein. The court was respectful at all times, displayed no hostility towards respondent and, contrary to respondent's claim, did not exhibit revulsion towards him personally, only towards child pornography and those who profit from it. Respondent has not shown that the trial judge's findings displayed "a deep-seated favoritism or antagonism that would make [his] judgement impossible." *Schellenberg v Rochester Elks*, 228 Mich App 20, 39; 577 NW2d 163 (1998).

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Michael J. Kelly

9